C. H. HAMILTON, FORREST I. HAMILTON, WILEY HAMILTON and DIXIE LOGDSON, v. WALTER H. STEININGER and KATHERYN D. STEININGER, his wife; ELMER R. WORNELL; JAMES H. BISHOP and GLADYS D. BISHOP, his wife; NONA MILLER; and FELIX SENEVEY, Appellants.—No. 38146.—168 S. W. (2d) 59.

Division One, February 2, 1943.

*Lewis H. Cook, John O. Bond* and *H. P. Lauf* for appellants.

700

*James P. Boyd, S. W. James, Jr.,* and *Curtis J. Quimby* for respondents.

702

 DALTON, C.—Action in equity to set aside three warranty deeds in usual form executed on one occasion by Mrs. Oma Knight, who is hereinafter referred to as deceased. Each deed purported to convey a particular portion of a single tract of business property to a different grantee (all defendants herein), but subject to a reserved life estate in the grantor. Deceased had no children, and her husband had predeceased her. Plaintiffs are the heirs at law of deceased, to wit, her three brothers and a daughter of a deceased sister.

The petition charged that, while deceased by reason of age, health and lack of experience in business matters was wholly incapable of managing her own affairs and of making contracts, and while one of said grantees was the confidential agent and advisor of deceased, the said grantees "acting in collusion and conspiracy to defraud these plaintiffs out of their just right caused the deeds" to be prepared, "and for the purpose of defrauding these plaintiffs out of their just rights" did persuade and unduly and fraudulently influence deceased to convey to said grantees, severally, the described valuable real estate for a nominal consideration. The answer of defendants was a general denial. The court found the issues for plaintiffs and granted the relief prayed on the ground that the said deeds were obtained "by undue influence and without adequate consideration," and were, therefore, "fraudulent and void ab initio." Defendants have appealed from the judgment.

In view of the fact that we are unable to agree with the conclusions reached by the trial court, we will set forth the facts rather fully. The described real estate is located on Madison Street in Jefferson City, and each of the three business buildings located thereon is reasonably worth from ten to twelve thousand dollars. The property contained four business places and rented for a total of $335 per month, Elmer R. Wornell was paying $165 per month, but this was later reduced to $115 and the remaining $50 per month was applied to fixing up the second floor of this building, until the repairs were paid for. James K. Bishop was paying $40 per month under a lease. J. O. Scrivner was paying $30 per month and Edmond Fischer $100 per month. Deceased and her husband, Arl Knight, acquired the property, as tenants by the entirety, in 1924, and they thereafter resided in an apartment on the second floor of one of the buildings. Arl Knight died on May 23rd, 1938, at the age of 67 years and deceased continued to reside in the apartment.

The grantees in the several deeds were not related by blood or marriage to deceased or her husband. Wornell and Bishop were tenants, as above mentioned. Walter H. Steininger was a close friend of both deceased and her husband. Prior to Arl Knight's death Steininger had kept the insurance records on the property in his own handwriting and he had prepared Arl Knight's income tax returns. The insurance records indicate that Steininger was agent or broker for some of the companies carrying part of the insurance on the buildings. Arl Knight, prior to his death, looked after and attended to all business matters. After his death, deceased in August, 1938, talked to Steininger about taking care of her business and he said he would be glad to do it. She told him she would settle with him and he replied that there wouldn't be any trouble about that. Prior to that date Steininger had been assisting deceased and he visited her frequently afterwards. Whenever she wanted to know anything or had any business with him, she would call him up. At her direction one of the tenants, a Mr. Scrivner, who appears to have been slow with rent and also with payments to deceased on a note secured by a chattel mortgage, paid his rent to Steininger. Steininger in most instances indorsed and deposited these checks, although one appears to have been cashed by Capital City Loan Company. Most of the checks bear the personal indorsement of deceased as well as Steininger's indorsement. Steininger continued to keep the insurance records on the buildings, that is, the amount of the policies, the companies and expiration dates, etc. Deceased told various persons that Steininger was looking after her business, or that she could get Steininger to look after this or that for her. On one occasion Scrivner, who had a five year lease to November 1, 1941, heard that deceased had given defendant Bishop a new lease and he inquired of deceased. She told him she had made the lease, but that it didn't

cover the part of the building occupied by Scrivner. She said she didn't read it, but "didn't think it was in there," and to see Steininger. Steininger told Scrivner the lease covered his place of business, after his lease expired. When Scrivner went back to deceased, she claimed she didn't know anything about it. The public administrator testified that he received deceased's bank accounts, to wit, eleven statements of the Central Missouri Trust Company, together with the cancelled checks, from Steininger in February, 1940. He also got the insurance records from Steininger. The defendants also had possession of certain letters received by deceased from her brother, and offered them in evidence.

There is further evidence that C. H. Hamilton, a brother of deceased, talked to Steininger and asked him to attend to deceased's business, because she was hard of hearing and couldn't attend to business. In this conversation he called Steininger's attention to the fact that they were members of the same fraternal organization and said he knew Steininger would treat ▮▮ them right. There is, however, no suggestion in the record that deceased ever authorized her brother to speak for her in any respect whatsoever or knew that he had done so. It is further contended that Steininger was deceased's confidential agent and advisor "regarding personal and domestic affairs." This conclusion appears to have been based upon statements in letters of deceased to her brother, as follows: "Stinegar thinks i am doing the Rong thing trying to keep it all together for you all; . . . he sed he wood pay my taxes for me," and upon the testimony of deceased's maid that deceased told her Steininger said she (the maid) should take her clothes and everything home with her, on an occasion when deceased was terminating her employment. There is evidence, however, that deceased attended to much of her own business. The rent checks from tenants, other than Scrivner, were brought to deceased and she indorsed these checks and sent them to the bank by her maid. Later she sent them by Wornell. Deceased also, from time to time, attended to having incidental repairs made on the buildings. In a letter to her brother, dated April 23, 1939, she mentions that she was having the front of her building painted the following week. She also had plumbing repairs made in March, 1939. She bought a tombstone for her deceased husband and herself and made payments thereon, and called the seller from time to time to come for the payments. She had a lock box in the bank and kept the key thereto, and attended to other business, for example in August, 1938, and August, 1939, deceased talked to the county assessor about assessments on her personal property for taxes. She didn't want a high assessment, because her "stuff" was getting old. She said she could get Steininger to look after the assessment for her, but if the assessment could be made "just like last year," she would do that, and accordingly signed. There was

also evidence that Wornell attended to some business for her. In a letter to her brother, deceased referred to the fact she had no one to go to the bank, until Wornell came home.

Deceased was a woman of limited education, if we judge by grammar, spelling, punctuation and capitalization in her two letters that were in evidence. She was a little more than 76 years of age at the time of her death. She was said to have been a delightful old lady, but she was very lonesome and was inclined to be nervous and had various troubles. Her health had not been good for many years and from time to time she was treated for her ailments. She had chronic arthritis, which caused pain in her back, feet and legs. Her feet and ankles were swollen and she was not able to go out or around, and seldom went on the street. Her arthritis affected her feet more than anything, but "she could get around the house pretty well." She told a Mrs. Jordan that defendant Wornell bought salve and medicine for her feet and legs and massaged them. She had an ear infection in June, 1938, and both ear drums were opened so that the infection could drain, thereafter her hearing was somewhat affected, but became almost normal. The ear infection came shortly after her husband's death and was made worse by her crying and grief. When the Madison Hotel, adjoining her property, burned on May 3rd, 1939, her apartment was filled with smoke and she became highly nervous and excited. Wornell ordered an ambulance for her and she was carried down the steps, since she contended she couldn't walk down, and was taken to a hospital. She remained in the hospital a day or so for treatment, before returning to her apartment. On May 5th, 1939, an X-ray was taken to determine her arthritic condition and the amount of involvment in the spine and pelvic bone. The deeds in question were executed on May 9th, following her return home. Deceased was not in the hospital again until February 8th, 1940, when she was taken there because of acute bronchitis and hypertension. Some four days later, on February 12th, she suffered a "stroke," or cerebral hemorrhage which was caused by arteriosclerosis or hardening of the arteries. On February 14th, 1940, while deceased was in the hospital, C. H. Hamilton filed an affidavit in the probate court charging that deceased was of unsound mind and asking that an inquiry be had therein. In connection with deceased's health condition, the evidence further shows that she had one maid (Jessie Thurman) for two years and four months prior to October, 1938, and claimed to have discharged her because she had a bitter temper and was eavesdropping all the time. Deceased had another maid (Arlene Kirschner) from October, 1938, to February, 1939. Thereafter, deceased lived alone in her apartment up to February 8th, 1940, and, apparently, did her own work and looked after herself.

There is no substantial evidence in the record that deceased was not of sound mind at all times prior to February 12th, 1940. On

the other hand, there was very substantial evidence on behalf of both plaintiffs and defendants, indicating that deceased was of sound mind. This evidence consisted not only of the opinions of lay and medical witnesses, but of facts and circumstances tending to establish that deceased was of sound mind, knew what property she had and what she wanted to do with it, and was able to transact and was transacting much of her own business. While it is true that C. H. Hamilton testified that he told Steininger, after Arl Knight's death, that deceased was "not capable of tending to business" it is also true that Hamilton, long thereafter, continued to act upon the theory that she was able to transact business and to sign notes for and to extend financial aid to him.

C. H. Hamilton, who resided in Kansas City, was the only plaintiff who testified, and he seems to have been the active plaintiff in the case. There was evidence that he had visited deceased perhaps six times within about two and one-half years prior to October, 1938, making two visits about the time of Arl Knight's death. A brother residing in California also visited deceased on one occasion prior to her husband's death. From all appearances the deceased was glad to have her brothers visit her. On one occasion deceased and her husband visited her brother at Kansas City and also her brother residing at West Plains, Missouri. They were accompanied by a maid and all were received and nicely treated. Deceased did not visit after her husband's death. Two letters from deceased to her brother in Kansas City were in evidence. One apparently written in answer to a special invitation and the other in answer to his letter. Both indicate a very friendly feeling towards her brother and his wife, although one letter includes a very firm refusal to lend him any money and further states that she expects to pay off a note she had previously signed for him as security and to pay it before the interest was due.

About three months after Arl Knight's death, deceased had her maid phone her brother in Kansas City and ask him to come down the following Tuesday to see her about making a will. She told the maid she wanted him to be satisfied with the will. The next Monday, however, deceased had the maid call him and tell him not to come, as she wasn't ready to make a will. Deceased's last maid testified that on several occasions deceased told her she was going to make a will and will her property to her brothers. Deceased's brother also testified that deceased's relations with her relatives were friendly. On the other hand there was evidence that deceased told the county assessor, who inquired about her people and whether she had anyone that could come and live with her, as follows: "'Yes, I've got people, but I don't want them around me; they never did care for me and Arl, and I don't want them around me and I don't want them to have anything I've got.'" There was evidence that, when an effort

had been made to buy the property from deceased and her husband, deceased said they could lease it but not sell it and her husband said he didn't know how long he was going to live and he didn't want any cash on hand, that "the way his folks had treated them and Mrs. Knight's folks had treated them that they weren't going to leave anything to either one of them, and they didn't want any cash on hand."

After Arl Knight's funeral, deceased told one of his pallbearers, that some of her husband's relatives "come in and wanted to force their way into Mr. Knight's box in the Trust Company and wanted to know what his property consisted of." She also said: "My folks are going to do the same thing, and I'm certainly going to see that they don't get anything. We have been treated awful bad by both sides, and I'm going to see they don't get any of our property." She told the party from whom she purchased the tombstone that she didn't care if she made her relatives mad; that they had "never warmed up" to her until the question of disposing of her property came up; and that she didn't feel like she owed them anything. She told the druggist, a Mr. Tanner, who delivered medicines to her, that "her relatives didn't care anything about her and they didn't come to see her and she didn't feel like she owed them anything." Deceased told plaintiff's witness, Chester A. Platt, who took the acknowledgments to the deeds, that "she had a family who had given her up several years back when she married Arl Knight. She said Arl Knight was a gambler and they didn't like him and had given her up."

Some twenty-seven letters from Hamilton to his sister, written in the last two years of her life, were in evidence. In ▮ many of these letters the writer complained because his sister did not write to him, and because she did not answer his letters, and he repeatedly asked her to write. Only two letters from deceased to her brother were in evidence. Hamilton, however, testified that if deceased could not write to him every week "she always called him on Saturday night."

Concerning the relationship between the deceased and the grantees in the several deeds, it is further apparent that all were friends of both deceased and her husband and that after Arl Knight's death they saw her quite frequently. Bishop and Wornell brought their rent checks up to her and Steininger saw her on business. According to deceased's last maid, they would come up to see her "every couple of days . . . they didn't stay long but they just came up to see her." "When she wanted something with them she would call them." This maid further testified that several times after they left deceased said they were just up there being friends with her to get her property. On one occasion an employee of the restaurant failed to hear deceased's radio in the morning and a key was secured from Bishop

to deceased's downstairs door and the door was opened, whereupon deceased came to the head of the stairs and said, "Mr. Wornell was drunk and he was sleeping off his drunk up there and she didn't want to disturb him." There was evidence also that Wornell would lock deceased's door downstairs at night, when he left his place of business, and would throw the key back in, so that the maid could come down and get it. The evidence further tends to show that deceased was very fond of Wornell; that she liked him; and that she repeatedly said that he looked after her a lot. In numerous letters from C. H. Hamilton to his sister, Hamilton recognized that Wornell was her friend and seemed to think a lot of her. He many times asked to be remembered to Wornell. He also wrote deceased as follows: "If you wanted to give Happy (Wornell) that saloon that was alright, but I cant see why you give those others them 2 places." He also inquired frequently about Mr. Bishop and asked to be remembered to him.

When the deeds were executed, deceased told Chester A. Platt, plaintiff's witness, that "she wanted this property to go to the people who had been nice to her during her lifetime . . . to the people who had taken care of her and made her happy during her lifetime." On the night of the day her husband was buried, deceased told witness W. W. Smith, one of the pallbearers who had a one and one-half hour's visit with her, what she was going to do with her property and that she would see that her relatives didn't get any of the property. Later in July, 1939, after the conveyances were made, she asked the witness what he thought about it. She further told him, "She was satisfied and that she could live in peace the rest of her life and wouldn't be bothered."

Deceased also talked to one Mace, the party from whom she purchased the monument. She told him of her property, its freedom from debt and the amount of rent she received. She told him she would have to pay for the monument in monthly payments. He made some twelve visits to see her and the last installment was paid June 1st, 1939. On Mr. Mace's visits, deceased became "friendly and talkative." She told him that Wornell, Bishop and Steininger "had treated her so nice, and always came when she called them, that she was going to deed this property to them"; that "she was going to give it" to them. She told Mr. Tanner, the druggist, supra, about how Wornell had "looked after her affairs and she thought she was going to leave that property" to him. Wornell was a tenant of that portion of the property deeded to him. Deceased told Dr. Gillham (her family physician over twenty-five to thirty years) that she had disposed of her property and she explained to him what she had done with it. She said "she was getting old and it was a burden to her and she wanted to dispose of it so she would be care free for her lifetime and not have to be worried with the care of it."

With reference to the activities of the grantees in connection with the execution of the deeds, the record shows that on April 28th, 1939, Richard D. Fowler, city engineer of Jefferson City, made a survey of the Knight property for Steininger and prepared separate descriptions of the property upon which each of the three buildings, was located. Steininger paid him for his work. Mrs. Nora O'Neal, stenographer in the office of Ira Lohman, a Jefferson City attorney, typed the deeds on May 6th, 1939, after Mr. Lohman dictated them. Mrs. Knight was not in the office, but Mr. Steininger was there and talked to Mr. Lohman about the deeds. Mrs. O'Neal did not see the deeds delivered to him. On May 9th, 1939, Mr. Steininger brought the draft of the three deeds to Mr. Platt. Steininger had seen him before with reference to preparing the three descriptions and had told him that the property was to be divided into three parts, and why. Steininger also said "that Mrs. Knight was very much afraid that in case of her death the property wouldn't go where she wanted it, and that she wanted to get it placed while she was living so she would know who had it after her death." Steininger said, "it was kind of embarrassing and that he really didn't want to take it." Platt and Steininger then went to the apartment of deceased, where Platt "talked it over with Mrs. Knight quite a while" before the deeds were acknowledged. Steininger had asked Platt to explain to deceased "just what these deeds would do in case of her death" and he did so. Deceased said: "I am well pleased. I want it to go that way." Deceased "wanted to be sure that she had a life estate" and said she thought the deeds better than a will. She then told Platt her reasons for making the deeds, as hereinbefore stated. Wornell, who had been out of town, came while Platt was there and deceased "was very glad to see him. Her face lightened up." When the deeds were executed, Steininger said to deceased, "Don't give us those deeds today, you might change your mind . . . we want you to be sure." She said she was sure. Steininger then told her to keep the deeds and "think them over" and be sure "what she wanted to do with them." Mr. Wornell said the same thing. "He wanted her to be sure." All of the evidence concerning what took place at the time the deeds were executed was by plaintiffs' witnesses. Although, Steininger employed Platt, it appears that Steininger, Wornell and Bishop paid their proportionate share for taking the acknowledgments, extending abstracts and other work.

Each of the three deeds recited a consideration in "the sum of Ten Dollars and other good and valuable considerations," however, all of the evidence tends to show a gift of the property and that no consideration was in fact paid to the deceased. The mere recital of consideration was fully explained by the evidence of both plaintiffs and defendants. Clark v. Skinner, 334 Mo. 1190, 70 S. W. (2d) 1094, 1097; Goodman v. Griffith, 238 Mo. 706, 142 S. W. 259. Ac-

cording to Hamilton, Bishop said that Steininger brought his deed to him, and Wornell claimed he was out of town when the deeds were made. All three deeds were promptly recorded, one on May 12th and the two on May 13th, 1939. Someone sent Hamilton a clipping with reference to the deeds being recorded, and he wrote his sister to the effect that "if there wasn't any provision made in there to bury her or take care of her if she got sick and went to the hospital" she would be a pauper. He also told her that she had done wrong in making the deeds and that she could change it and he wanted her to change it. Hamilton came to Jefferson City early in July, 1939, and saw deceased and the grantees in the deeds. Steininger told him about the execution of the deeds. Bishop told him he had "paid $10 to Steininger and $50 to the lawyer," but that the first he knew of it, Steininger brought the deed to him. Hamilton took Steininger up to deceased's apartment. Hamilton said Steininger didn't want to go, but wanted him to get Wornell. When Hamilton and Steininger came to the apartment, deceased said to Hamilton, "I thought you was gone," and he replied, "No, I met Mr. Steininger down there and we thought we would come up and see what you have got to say about deeding it away." Deceased said, "I don't want to talk about it, I'll have one of my nervous breakdowns or nervous fits." She also said, "I don't want to talk about any deeds . . . 'I don't want to hear anything about it," so Steininger turned and went down the steps without saying a word. Hamilton said he went to see his sister and took Steininger because he "wanted to be sure she knew what she did and if she did, it was alright."

In his letter to deceased dated July 12th, 1939, after his trip to Jefferson City, Hamilton concedes that when he and Steininger came up to see her she would not listen to them. In this letter he also accuses Bishop and Steininger of lying to him and says that Bishop tried to lay it on "Happy" Wornell and that Steininger said he tried to keep her from doing what she did. He concedes that he had told her she ought to do something about her property. He further states "Oma I know you think when I come to see you or when I write and tell you anything I am allways wanting something but Oma that is not so. I come to see you because you are my sister and I love you as a brother should love his sister." On August 20th, 1939, he wrote deceased as follows: "I had a letter from your gardeen and he said the way them papers was mad out you did not have a nickle in the world and I gess he knows what he is talking about. He said you was a dam fool for giving your property away. Well I havent answered his letter yet and I don't know as I will." Deceased, of course, had no guardian.

On August 30th, 1939, he wrote his sister as follows: "Well Sister how is Happy. Well I gess he is happy since you give him that building and I gess Bishop is still happy to and Stiniager I gess

he is more than happy since he got your home. Oma I dont know what I could have done that you turned against me like you did. You told me more than once you was going to give me the building you live in and when I come down there and went and found out that you had deeded your property all to some one else Oma you dont know how I felt. . . . Oma I know that the property is yours and you have the right to do what you please. But Oma you promised me so many things that you was going to do for me and then do what you have done. I dont think you care one thing about your brother, and if you want to lisen to someone else that is o. k. but Oma the ones you give it to does not need it like I do. They are all young and have plenty and here I am hardly enough to eate. But Sister that is all o. k. if that is the way you want it.'' On September 18th, 1939, he again complained that she had promised him many things and had not kept her promise and complained of what she had done with her property. 'He then said: ''You can change it yet if you want to, but if you don't I gess I will live just the same, but as a brother to a sister I think you have done rong. You know Oma I told you if you wanted to give Happy that saloon that was all right, but I can't see why you give those others them 2 places. But Oma if you won't change it, you can let me know, but if I was you I would have it changed but you can do as you like.'' On October 6th, 1939, he wrote her as follows: ''Oma I gess I will loose my car and my home two. I owe so much taxes I cant pay them and I dont know what I will do. I think sometimes if I could do somethink to end the hole thing it would be better.'' On December 11th, 1939, he wrote her as follows: ''We are going to look for you Oma I havent paid my taxes yet I have got to the 17teenth. Thay are one hundred & 3 dollars I gess I can borrow some on my house hole good but I dont know how I will pay it back Well I gess there will be some way. I hope Santa will come before the 17teenth.''

On July 26th, 1939, deceased's niece, one of the plaintiffs wrote deceased that ''Uncle Cleddy'' (C. H. Hamilton) had written ''about you not having much money left and that you would have to live with him and then again he says you have let three men get around you and get your property.'' On March 31st, 1939, C. H. Hamilton asked deceased to help him with the payments on his automobile. On April 23rd, 1939, deceased refused to make the loan, saying: ''Cleda i cant see how i can spare you iney money .i ow a bout 4 hunderd dolars and it is going to cost me 2 hunderd and 50 to git the frunts panted i am going to have it done nex week i never think of new close thare is six of you all let them help some.''

The record shows that deceased's brother, C. H. Hamilton, apparently used every effort possible to get the deceased to repudiate the deeds in her lifetime. He repeatedly called her attention to her promises to him and insisted that she had not treated him like a

brother. He pictured his illness and that of his wife and emphasized the cost of medicines. He discussed his extreme need of funds and his inability to pay his debts and taxes. He repeatedly expressed his love for deceased and said he would do anything for her, even to taking the shirt off his back. He played upon childhood memories, upon family relationship, and upon his hurt feelings because of the way she had treated him. He several times even hinted at suicide, and suggested the whole world was against him. He spoke of the danger of losing his automobile and his home and of his dislike to seek charity from the city. He told her Steininger said she was crazy to give her property away and claimed that Steininger had admitted he had done him wrong. He accused Steininger and Bishop of lying to him and violating fraternal ties. He told her that "if thay done me like thay did thay will do you the same way." He told her it would have been alright if she had given the whole property to "Happy," but he could not understand why she gave anything to the others. He told her "them fellows did look at (me) as if to say you dam fool we put one over on you." He said he could not face them "unless things are different." He asked her to change things and told her she could, if she wanted to. However, there is not a hint or suggestion in the evidence that deceased ever questioned the conveyances or sought to repudiate them in any way. On the other hand, she expressed her entire satisfaction with what had been done. Although the conveyances were made in May, 1939, and promptly recorded and, although Mr. Hamilton was fully advised as to the facts, he took no action of any kind, other than above stated, until after deceased had suffered a stroke on February 12th, 1940. Two days thereafter he filed the affidavit in the probate court. There is no evidence that deceased was not of sound mind up until February 12th, 1940, and during this time plaintiff Hamilton fully and repeatedly presented his position to her, but she refused to repudiate or disaffirm the conveyances now sought to be set aside.

When deceased's estate was fully settled up, and all debts and costs of administration fully paid, there was no personal property left, except a $230 note of C. H. Hamilton which was uncollectible and the administrator was permitted to take credit for it.

In an equity case we hear the cause de novo and determine the weight and value of the evidence, but this court will usually defer to the findings of the chancellor where there is conflicting verbal testimony involving the credibility of witnesses who appeared before him. Shaw v. Butler (Mo. Sup.), 78 S. W. (2d) 420, 421; Lastofka v. Lastofka, 339 Mo. 770, 99 S. W. (2d) 46, 54.

In this case the trial court set the deeds aside on the alleged ground that they were obtained by the grantees "by undue influence and without adequate consideration." The issue of consideration is not involved, since the evidence of both plaintiffs and defendants con-

clusively shows that the deeds in this case were not for the exchange of values within the ordinary meaning of conveyances of real estate, but were intended by the deceased as gifts of the property to the grantees in consideration of the fact that she considered them her friends and because they had been friendly and kind toward her. The mere recital of consideration in the deeds was fully explained and there is no evidence that the transfers were intended as bargain and sale transactions. No issue as to rights of creditors is involved. All creditors, and the costs of administration of deceased's estate, have been fully paid. Only the right of collateral relatives to set aside conveyances by deceased made by way of gifts is involved, even under the evidence of plaintiffs.

The cancellation of a deed is an exercise of the most extraordinary power of a court of equity and this power ought not to be exercised except in a clear case. Cohron v. Polk, 252 Mo. 261, 281, 158 S. W. 603, 609; Lastofka v. Lastofka, supra, (99 S. W. (2d) 54); Platt v. Platt, 343 Mo. 745, 123 S. W. (2d) 54, 55; 9 Am. Jur., p. 400, Sec. 60. The evidence to justify such action should be clear, cogent and convincing. Bross v. Rogers (Mo. Sup.), 187 S. W. 38, 39; Shaw v. Butler, supra, (78 S. W. (2d) 420, 429); Robinson v. Field, 342 Mo. 778, 117 S. W. (2d) 308, 315(9); Stubblefield v. Husband, 341 Mo. 38, 47, 106 S. W. (2d) 419, 423(3); Ulrich v. Zimmerman, 349 Mo. 772, 163 S. W. (2d) 567, 571; 12 C. J. S., Cancellation of Instruments, p. 1060, Sec. 71.

In this case deceased left no husband or direct descendants surviving her. The deeds were executed and recorded in her lifetime, while she was of sound mind. She remained of sound mind for a long period thereafter. The grantees had long been the friends of both deceased and her husband. There is no evidence of regret, repudiation or disaffirmance during her lifetime, and regardless of the insistent complaints of her brother, who claimed to be on the friendliest of terms with her. The decisive issue in the case is whether the conveyances were voluntary or whether they were obtained by undue influence of the grantees. On this issue, the burden of proof in the first instance rested upon the plaintiffs. Reaves v. Pierce (Mo. Sup.), 26 S. W. (2d) 611, 617.

"Undue influence, which is sufficient to warrant a court in holding a will or a deed invalid, must be such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another." Shaw v. Butler, supra, (78 S. W. (2d) 420, 428); Patton v. Shelton, 238 Mo. 631, 40 S. W. (2d) 706, 714; Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46, 51. There must be proof of such undue influence, either in fact or presumptively.

Respondents contend that the evidence establishes "a fiduciary and confidential relationship" between deceased, Steininger and Wornell, which "coupled with the positive proof of the per-

nicious activity upon the part of defendants Steininger and Wornell in procuring the execution of the deeds, raised the presumption of undue influence'' and shifted the burden to defendants. Respondents further say that, ''this presumption of undue influence was not rebutted by defendants.'' We think the evidence wholly fails to show any confidential relationship between deceased and Wornell. The evidence shows that he was her close personal friend; that he was recognized as such by others, including her brother, but that he acted under her direction to assist her. There is further no direct or circumstantial evidence that he induced or caused the deeds to be executed.

There is evidence from which an inference can and we think should be drawn that Steininger stood in a position of trust and confidence to the deceased and that confidence was necessarily reposed in him. He possessed the influence which naturally grew out of that relationship, but there is no direct evidence that his position was used to exert an undue influence to obtain an unfair advantage. We find no fact or circumstance in evidence directly tending to show that Steininger by word or act unduly influenced the execution of the deeds or exerted influence of any kind in that behalf. Reference is made to deceased's excuse for refusing aid to her brother on his automobile payments, to wit, that Steininger thought she was doing the wrong thing in ''trying to keep it all together for you all.'' A court of equity could hardly accept that recital as substantial evidence of undue influence on the part of Steininger to cause the execution of the deeds in question. Respondents further point to the fact that Steininger selected and employed the surveyor, the abstracter, the lawyer and the notary public; that he caused the deeds to be presented for execution and explained to deceased; and that he thereafter delivered the deeds. Although the witnesses testifying to these several matters were plaintiffs' witnesses they testified to no facts dirctly tending to show undue influence to cause the execution of the deeds. Even after execution, the deeds were left in the possession and control of the deceased for several days.

The mere fact of a confidential relationship does not raise a presumption of undue influence. Not only must it have shown that deceased by reason of age, state of health and illiteracy was subservient to the dominant mind and will of Steininger, but that he caused or assisted in causing the execution of the deeds and thereby obtained an unfair advantage at the expense of the confiding party. Of course, it is not necessary that undue influence be proven by direct evidence. It may be shown by or inferred from facts and circumstances in evidence. Fessler v. Fessler. 332 Mo. 655, 60 S. W. (2d) 17, 23. The mere opportunity to influence, or mere suspicion of undue influence, unsupported by evidence showing its actual existence, is not sufficient. Teckenbrock v. McLaughlin, supra; Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772, 776.

■ While we think the facts and circumstances in evidence in this case were sufficient for a jury in a law case to draw the inference that Steininger induced, suggested or caused deceased to execute the deeds, they are not sufficient in our opinion that a court of equity should draw such an inference in view of all the evidence in the record. Respondents have cited many cases wherein this court has held that an issue of fact for a jury as to undue influence in a will contest case has been made out and a demurrer to evidence properly overruled. They are not decisive here. Reaves v. Pierce, supra.

Concerning the inference or presumption of undue influence arising from the fact of a confidential relationship between the grantor and grantee and facts and circumstances from which an inference could be drawn that the grantee had been active in some way which caused or assisted in causing the execution of the deed, this court in the case of Loehr v. Starke, supra, (56 S. W. (2d) 772, 776) said: ''The presumption under consideration is not a mere legal fiction or procedural rule. It rests on a substantial basis of fact or inference. The presumption and fact, or inference, go hand in hand and really are the same thing. Hence, the presumption, with its underlying facts or inferences, once being in the case, never does or can disappear but raises an issue for the jury.'' See, Pulitzer v. Chapman, 337 Mo. 298, 85 S. W. (2d) 400, 412; and Dimity v. Dimity (Mo. Sup.), 62 S. W. (2d) 859, 863.

■ While the presumption of undue influence does not arise unless, in addition to proof of the fiduciary relation and of a benefaction to or in the interest of the fiduciary, there be further facts and circumstances in evidence from which it can be inferred that the fiduciary beneficiary was ■ active in some way which caused or assisted in causing the execution of the deed, the presumption may be overcome by evidence showing that the deed in fact expressed the wish of the grantor and was the result of voluntary action. Patton v. Shelton, supra. We think it is immaterial in this case, however, whether it be held that the facts and circumstances in evidence were sufficient to justify this court in holding that a presumption of undue influence arose, because in any case such inference or presumption was overcome by the undisputed evidence in the case, which tends to show that deceased was fully satisfied with what had been done with her property and refused to question it, disaffirm or repudiate the conveyances, even at the most insistent suggestion of her brother. There was also evidence that it had long been her purpose to do what she did, and that her purpose to exclude relatives had been determined even prior to her husband's death. In addition, if the personal relationship between deceased and her brother was only a fraction of the strength claimed for it by the plaintiffs and if deceased was imposed upon by the grantees in the deeds and her will power overcome by fraud, coercion, and undue influence, as claimed, one cannot conceive of deceased failing to repudiate the

conveyances in view of all of the efforts in that behalf which were made during her lifetime. Deceased clearly was not subject to undue influence by her brother. Considering all of the evidence in the case, we must and do hold that undue influence on behalf of defendant grantees to cause the execution of the deeds has not been satisfactorily established. On the other hand, the overwhelming weight of convincing evidence supports the conclusion that the conveyances were executed freely and voluntarily with a full knowledge of their purpose and effect and not as a result of the undue influence of the grantees or any of them.

Respondents further contend that a conspiracy by Bishop, Wornell and Steininger to defraud the plaintiffs, as alleged in the petition, was fully established by the evidence. They insist that Bishop, Wornell and Steininger ''acted in concert in procuring the deeds,'' and that the conspiracy charged was proven by circumstances and the ''direct action of defendants.'' In this case the trial court failed to find that a conspiracy to defraud plaintiffs existed in fact and we think the evidence quite insufficient to establish such a conspiracy and so hold. It is not a question whether the evidence would have been sufficient to present an issue of fact for a jury in a law case, but whether a conspiracy to defraud plaintiffs existed in fact.

Respondents further insist that there was conflicting evidence concerning the personal relationship between deceased and her relatives and for that reason we should defer to the finding of the trial court. The court's finding, however, was not based upon that issue but upon the theory that the deeds were obtained by undue influence and without adequate consideration. Considered as a whole, we find little real conflict in the evidence affecting the decisive issues in the case. The evidence is not sufficiently clear, cogent and convincing as to justify the cancellation of the deeds. The finding of the trial court cannot be sustained. The judgment is reversed. *Bradley, C.,* concurs; *Van Osdol, C.,* not sitting.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.