John EARLY, Jr., Appellant,

v.

John KOELBEL, Minnie M. Koelbel, John C. Koelbel, Jr., and Catherine V. Koelbel, Respondents.

No. 44138.

Supreme Court of Missouri.

Division No. 2.

Nov. 8, 1954.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 13, 1954.

S. D. Flanagan, E. D. Franey, Hay & Flanagan, St. Louis, attorneys for appellant.

William H. Leyhe, Jr., and A. E. L. Gardner, Clayton, attorneys for respondents.

BOHLING, Commissioner.

John Early, Jr., instituted this suit against John Koelbel and Minnie M. Koelbel, his wife, and John C. Koelbel, Jr., and Catherine V. Koelbel, his· wife, to cancel certain deeds hereinafter described, and a

judgment for amounts received by the respective defendants for easements granted over the real estate involved.

John Early, the father of plaintiff, owned 120 acres of land in St. Louis County, Missouri, of a value, according to the record, of $300 an acre in June, 1946. On June 10, 1946, he conveyed the south 60 acres of said 120 acres by warranty deed to John Koelbel and Minnie M. Koelbel, his wife. This deed was recorded June 17, 1946. On May 29, 1947, John Koelbel and Minnie M. Koelbel conveyed by warranty deed of gift 11.72 acres, more or less, of said 60 acres to John C. Koelbel, Jr. (their son), and Catherine V. Koelbel, his wife. This deed was recorded June 5, 1947. On June 5, 1951, the Koelbels, Sr., executed a quit claim deed to the Koelbels, Jr., to correct the description in their warranty deed. The quit claim deed was recorded June 20, 1951. On March 13, 1951, the Koelbels, Sr., granted an easement across their land to the Union Electric Co. of Missouri, receiving $851 therefor. On May 29, 1951, the Koelbels, Jr., granted an easement across their land to the Union Electric Co. of Missouri, receiving $5,475 therefor. These deeds and considerations are involved in this litigation.

The grounds set forth in the petition were mental incompetency on the part of John Early and undue influence exercised over him by Mr. and Mrs. Koelbel, Sr. The trial court found the issues for the defendants and plaintiff has appealed. On this appeal plaintiff does not contend that said grantor was insane but that he was mentally weak and this factor is for consideration on the issue of undue influence. Shafer v. Hatfield, 359 Mo. 673, 223 S.W.2d 396, 402[4]; Morris v. Morris, Mo., 4 S. W.2d 459, 463[3, 4].

John Early, Jr. and John Koelbel are of the same age, having been born about 1883 and being 70 years of age at the time of trial in 1953. Mrs. Early, Sr., died a few days after plaintiff's birth. Louisa Koelbel was the mother of John Koelbel and a sister of John and George (a bache-

lor) Early. She and her son John, then about 3 years of age, went to live with John and George Early on the farm, the household consisting of John Early, George Early, Louisa Koelbel, John Early, Jr., and John Koelbel. Mrs. Koelbel had several children but John was her only child living on the Early farm.

Louisa Koelbel died a few months before George Early, who died October 31, 1944. Later in 1944 there was a sale of the personal property ("it didn't amount to much") at the farm and John Early, Sr., went to live with Mr. and Mrs. John Koelbel in St. Louis, and continued to live with them until his death. He died intestate in his 91st year on March 5, 1951, leaving as his sole heir at law his son, the plaintiff.

John Early, Jr., finished the second grade. He worked on the farm and at other places. He married in 1912. He had seven children, five of whom are living. He is a common laborer, owns no automobile, is poor, and pays $23.50 a month rent.

John Koelbel finished the fourth grade. He left the farm when he was about 22 years old and worked at different jobs. When he was out of work he would return home, to the farm. He has lived in the city of St. Louis since 1927 or longer.

John Early, Jr., his wife, and his daughter Mrs. Hilmer Mahn each testified that he or she had no knowledge of Early, Sr.'s deed to the Koelbels or the sale of the personal property following George Early's death until after the death of John Early.

Plaintiff, his wife, and his cousin Walter Gebhart testified that John Early, Sr., and John Early, Jr., and members of his family were on good terms.

Plaintiff, his wife, his daughter Mrs. Hilmer Mahn, Harold Casper, a cousin of Koelbel, Sr., and Ed Early, defendants' witness, stated Early, Sr., could not read or write. Plaintiff also had evidence that Early, Sr.'s hearing and eyesight were failing after George Early's death.

Plaintiff, his wife, and Mrs. Mahn testified that Mr. or Mrs. Koelbel or both were always with Mr. Early, Sr.; that they were not permitted to have a private conversation with him or to be with him alone at the Koelbel home or when he visited them.

*Plaintiff's witnesses* gave the additional following facts:

Mrs. John Early, Jr. She visited John Early whenever she had a chance to ride. (Mrs. Mahn's statement that she took them "several times" in her automobile is the only evidence of someone taking plaintiff's family to visit Early, Sr.) While at the Koelbel's she invited Early, Sr., to her home and, after he noticed that Mr. and Mrs. Koelbel were present, he answered: "Yes, they will bring me down." They would visit with him for an hour or a few hours. On one occasion when Mrs. Koelbel was complaining about Early, Sr., soiling his clothes, she told her to bring him "home to me"; and Mrs. Koelbel said: "I can't do that; John won't allow it." Another time Mrs. Koelbel told her Early, Sr., did not like her and she should not go in, but she went in and he was "all right towards me," but he didn't recognize her right away, and they talked about the weather. In the Fall of 1947 Early, Sr., failed to recognize their daughter "Patsy" at first but, after being told, he said, "Oh, I remember now, Pats." In 1946 they talked about their son "Joey," who was in the armed services on Okinawa, and Early, Sr., had to think who Joey was. She "guessed" Joey used to go out by himself as Joey would say he was going there. She stated John Koelbel handled the business affairs of and did the banking for Early, Sr.

John Early, Jr., lived in Oakville after his marriage in 1912 and moved to St. Louis in 1928. He would walk to the farm to visit Early, Sr. After he moved to the city he rode the bus. He said he walked "about 25 [miles] or something." He did not know how far Oakville was from the farm. (Other testimony established that Oakville was about 6 and St. Louis about 10 miles from the farm). John Koelbel handled the business affairs and banking for Early, Sr. Asked whether he had his father visit in

his home he said his father told him maybe Mr. Koelbel wouldn't like it. His father called him "George" after George died, but he told him he was "John." Asked on direct examination whether his father ever spoke to him about who was to get the farm, he answered: "Well, he spoke to me that John should get the farm. Q. How? A. John should get—John should have the farm"; and upon further questioning that his father never said anything to him about the farm but that his wife and daughter Mrs. Mahn talked about it. He testified John and he lived as brothers on the farm.

Harold Casper is a grading and excavating contractor and grandnephew of Early, Sr. Once, at strawberry time he heard Early, Sr., say he was sending some money to the bank with John Koelbel, who was helping them. Mrs. Early, Jr., asked Early, Sr., upon George's death, if he were coming to live with them and he answered: "No, I'm going back on the farm." John Early, Sr., stayed on the farm, was agreeable, would not talk back or argue, and could be influenced "to a certain extent." After Early, Sr., went to the Koelbels, he saw him on the street 5 or 6 times and a year or two later had lunch there. Early, Sr., was then forgetful. In the Fall of 1950, when he was passing in an automobile he recently purchased Early, Sr., was sweeping leaves in the street. Early, Sr., did not recognize him until he told him who he was, and then stated he was getting the leaves for the flowers and rose bushes. He asked why he never came to see him, and Early, Sr., replied: "John don't want me to." He stated the south half was much more valuable than the north half of the farm.

Charles H. Meinhardt married John Koelbel's sister. Early, Sr., could sign his name and maybe make a few figures. He would never say "no." He was at the personal property sale and stated John Koelbel "handled it," but did not recall who acted as cashier. He saw Early, Jr., at the farm a few times, "not too much"; "They never had much to do with one another, that's all."

Walter Gebhart's mother was a sister to Early, Sr. He visited the farm once in a while and saw Early, Jr., working there once in a great while. Early, Sr., was a "good fellow" and "easy-going." He only saw him once after 1944.

Early, Sr., and John Koelbel had a joint $500 time certificate of the Lemay Bank and Trust Company from May 24, 1934, until May 23, 1941, when it was converted to a joint savings account. This account, with interest, $536.10, was terminated August 1, 1951, when two cashier checks, one to John Koelbel for $378.50 and one to Mrs. Hilmer Mahn, administratrix of the John Early, deceased, estate, for $157.60 were issued.

Mrs. Hilmer Mahn, 38 years old, daughter of plaintiff. She stated Early, Sr. went to live with the Koelbels about a year and a half after George died. She visited the farm once or twice during this period and Early, Sr. was very forgetful; "at times didn't know anyone"; called her "Lizzie" (his wife's name), the first time about a year after George died. He was "continuously scared of John Koelbel." He was never capable of taking care of his business. He was easily led. She visited him twice a month on the average at the Koelbels. The window shades would be up as she approached, but by the time she reached the gate they were down. They brought Early, Sr. to see her in 1946 while she was recuperating from an operation and she asked him to stay with her. He answered: "No, Hilmer, I can't stay with you; John would get mad"; and John said: "Let's go home." She "didn't know anything about" who handled Early, Sr.'s affairs after George died, but later stated "John Koelbel handled his affairs because he admitted he had his money"; "He gave me the remainder of it." She, as administratrix of Early, Sr.'s estate, did not pay the doctor or hospital bills; John Koelbel was supposed to pay them; she paid the funeral bill, stating "I made a mortgage on" the farm.

Plaintiff offered the deposition of Herman Paule, who died about six weeks prior to the trial. Mr. Paule was a notary public.

John Koelbel came to his office and spoke to him about preparing the deed. He insisted on having the title before he prepared it. Witness ordered the title and prepared the deed. The deed was signed in the dining room of the Koelbel home, where he first saw Early, Sr., in connection with the deed. Early, Sr., and witness were seated on one side of the dining table and the Koelbels on the other. Witness explained to Early, Sr., that he was selling the piece of property and declared himself to be single, and asked him if he knew what he was doing, and Mr. Early said yes and they were supposed to be treating him good for as long as he lived. Early, Sr., was of sound mind. Witness read the deed to Early, Sr., and told Mr. Early he understood he wanted to transfer the land described to the Koelbels, and Mr. Early said "'Yes, they are taking care of me and I want to give them that property.'" Mr. Early signed the deed but got it scratched up, and witness had him sign it a second time. He was not informed that Mr. Early could not read or write. He knows he wrote his name. Early, Sr., handed the deed to the Koelbels, he thinks to John Koelbel, and it was given to him to record. John Koelbel paid all the charges connected with the matter and witness gave him a receipt. Neither Mr. nor Mrs. Koelbel said anything about the deed. while in the dining room. Witness put in the consideration at "One Hundred Dollars (100) and other valuable consideration." The deed carried $1.10 in revenue stamps. It was stipulated that no money passed.

*Defendants' witnesses.* Dr. Roy C. Dripps, a practicing physician of 39 years, treated Early, Sr., for minor ills between 1947 and February, 1951. Early, Sr., was sane. He was getting old and a little feeble, and his mind was not as alert as if he had been younger, but it was sound.

The following witnesses testified that they had known John Early, Sr., during the period involved and longer, and that he was sane and normal at all times. Ed Early, a grandnephew of Early, Sr.; Fred Benedek, Koelbel Sr.'s son-in-law; William Goessling, Koelbel's brother-in-law; Walter Williams, nephew by marriage of Koelbel; Alvin Gebhart, a grandnephew of Early, Sr.; John Koelbel.

Ed Early stated he was a little hard of hearing but Early, Sr., and he would stand and talk very easily. Fred Benedek visited the Koelbels every week or two. Early, Sr., had no trouble hearing, understanding, or in recognizing him. At times the Koelbels would be there but Early, Sr., would be away. John Koelbel took Early, Sr., to William Gebhart's many times and returned home without him. Alvin Gebhart testified that Early, Sr., visited their farm quite often while living with the Koelbels, three or four weeks at a time, and helped out; that when witness built his house in 1949 Early, Sr., stayed with them and took care of five young mules and the chickens.

Elmer C. McMenomy operated an automobile body and paint shop in the Koelbel neighborhood. He testified that Early, Sr., after he moved in with the Koelbels, was at his place almost daily; that he would help him at times with his work and make worth while observations concerning it; that he would sit in a chair and look at the newspaper, turning the pages, talked very intelligently, understood business transactions and was mentally sound and spry for a man of his age. He thought Early, Sr., could read and his hearing and eyesight were good.

John C. Koelbel, Jr., testified that Early, Sr., gave him advice when he was building his home in 1947, and that he would look at catalogues and make remarks and he thought he could read, but he never saw him sign his name.

■ Suits in equity are tried de novo upon appeal; and appellate courts give due deference to the findings of the chancellor resting upon parol evidence. St. Louis Union Trust Co. v. Busch, 346 Mo. 1237, 145 S.W.2d 426, 430[1, 2]; Galloway v. Galloway, Mo., 169 S.W.2d 883, 889[20, 21]; Meyer v. Schaub, Mo., 266 S.W.2d 620, 621[1–3].

The cancellation of a deed by a court of equity requires clear, cogent and convincing evidence justifying such action. Schneider v. Johnson, 357 Mo. 245, 207 S. W.2d 461, 466[2, 3]; Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 67; Nelson v. Hammett, Mo., 189 S.W.2d 238, 242 [4]; McCoy v. McCoy, 360 Mo. 199, 227 S. W.2d 698, 703[3].

"'Undue influence, which is sufficient to warrant a court in holding a will or a deed invalid, must be such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another.' * * There must be proof of such undue influence, either in fact or presumptively." Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 67[4, 6], citing authority; Patton v. Shelton, 328 Mo. 631, 40 S.W.2d 706, 712; Michaelson v. Wolf, 364 Mo. 356, 261 S.W.2d 918, 925. The evidence of undue influence must be of such potency as to destroy the free agency of the grantor at the time of making the deed. Clark v. Leonard, Mo., 232 S.W.2d 474, 478[2].

We think the record sustains the decree of the trial chancellor. Early, Sr., on June 10, 1946, was 85 years of age, in good health and of sound mind. As stated by the trial court, the evidence when viewed most favorably to plaintiff was probably sufficient to raise a presumption of undue influence on the part of defendant John Koelbel, with whom Early, Sr., lived from late 1944 until early 1951 and who handled a few business matters during that period for Early, Sr., and made arrangements with the notary for the execution of the deed and paid the expenses connected therewith.

Plaintiff had the burden of proof on the issue of undue influence. Defendants did not have the burden of disproving undue influence. They were entitled to a determination of the sufficiency of plaintiff's evidence whether they adduced evidence or not as the credibility of plaintiff's witnesses and the weight of their testimony was for the trier of the facts. During the progress of a trial a situation may arise when plaintiff's evidence is sufficient to warrant a finding in his favor if defendant fails to meet his burden of going forward with the evidence to rebut plaintiff's case. However, a plaintiff's evidence may be sufficient to present a fact question and fall short of compelling a finding of undue influence invalidating a deed. Nelson v. Hammett, Mo., 189 S.W.2d 238, 243[9]; Been v. Jolly, Mo., 247 S.W.2d 840, 854[4–8]; Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 67[5–10]. There is a difference between a delivery of personal property to another which may or may not pass the title according to transferor's intent, as the delivery does not prove a gift, and the execution of a duly acknowledged deed, expressing on its face the intent of the grantor, and its delivery to and recording by the grantee. Stallcup v. Williamson, 361 Mo. 440, 235 S.W.2d 318, 321, citing cases; Horn v. Owens, Mo., 171 S.W.2d 585, 592; Michaelson v. Wolf, 364 Mo. 356, 261 S.W.2d 918, 924.

The trial court was not convinced that Early, Sr.'s deed was the result of undue influence invalidating it. Many questions asked plaintiff's witnesses were leading and many answers were conclusions unsupported by facts of record. Some answers appear based upon hearsay and the witnesses' testimonial qualifications on particular answers subject to question. Early, Sr., had reared plaintiff, his son, and grantee John Koelbel, his nephew, as if they were brothers. Although plaintiff's financial condition was bad, he inherited 60 acres of his father's 120 acre farm. Early, Sr., explained to Mr. Paule that the Koelbels were taking care of him and he wanted to give them the 60 acres described, and that they were supposed to be treating him good as long as he lived. The presumption of undue influence, if in a case, may be overcome by evidence that the deed expresses the wish of the grantor and was his voluntary act. Been v. Jolly, supra. Early, Sr., lived with the Koelbels from late 1944 until his death in March, 1951. The stated consideration, $100 and other valuable consideration, was open to explanation. Schneider v. Johnson, 357 Mo. 245, 207 S.W.2d 461, 467[6–9]. The deed appears to be the re-

sult of the love and affection the grantor had for the grantees and in recognition of what they had done and what he anticipated they would do for him, and not the result of bargaining between the parties. The consideration is not a controlling factor here. As the facts eventuated the grantor lived in the grantees' home for more than six years, and for approximately five years after his deed. His confidence was not misplaced. The deed was spread of record June 17, 1946. Early, Sr., never questioned his deed. He never complained to anyone of undue influence or persuasion exerted upon him or any inadequacy of consideration or of any mistreatment on the part of the grantees. He did much as he pleased. He was on the streets by himself. He stayed at the Alvin Gebhart farm quite often for several weeks at a time. He visited witness McMenomy's auto body and paint shop practically daily, staying for an hour or two according to his desire and sometimes came back later in the day. It appears that members of plaintiff's family could have been alone with him.

Perhaps the defendants should have adduced more testimony, especially more details casting doubt on certain facts bearing on the issue of undue influence by plaintiff's witnesses. However, if the trial chancellor was not convinced of the invalidity of the deed by plaintiff's witnesses, as his decree indicates he was not, our study of the instant record results in the conclusion that he arrived at the correct decree.

The judgment is affirmed.

WESTHUES and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

LEEDY, Acting P. J., ELLISON, J., DEW and ANDERSON, Special Judges, concur.