247 S.W.2d 840 (1952)
BEEN et al.
v.
JOLLY et al.
No. 42038.
Supreme Court of Missouri, Division No. 2.
April 14, 1952.
*842 C. M. Hulen, Moberly, for appellants.
Hunter, Chamier & Motley, Moberly, for respondents.
LEEDY, Judge.
Action to set aside a warranty deed and two bills of sale (to personalty located on and used in connection with the real estate conveyed by the deed) and for an accounting of the rents and profits, on the grounds of grantor's mental incompetency and undue influence exerted over him by grantees, the defendants. The trial court found for defendants, and plaintiffs appealed.
The challenged conveyances were made by A. C. Sibbitt, as grantor, to Benjamin S. and Nina W. Jolly, husband and wife, as grantees. The first-named grantee is an osteopathic physician practicing at Moberly, who, in the last several years of grantor's life was the latter's physician. The instruments were dated and acknowledged October 31, 1947. The deed, reciting a consideration of "One dollar and other good and valuable considerations," reserved a life estate in the grantor, and was filed for record November 4, 1947. The bills of sale were so filed December 5, 1947. The grantor's death occurred in September, 1949. The plaintiffs are grantor's nieces and his sole heirs at law.
The real estate, located in the City of Moberly, is business property having a market value from $25,000 to $40,000. The principal improvement consists of a large two-story brick building erected in the 1890's, and known as the Sibbitt Building or Sibbitt Apartments, fronting 100 feet on East Coates Street, and bearing street numbers 101 to 107, both inclusive. The location is referred to as being "on the east side of town." There are five business rooms or shops on the first floor, and eight furnished apartments and two single sleeping rooms on the second floor. Also on the premises is a sizeable concrete block garage (for commercial purposes), as well as eight single garage stalls located at the rear of the property. The personalty described in the bills of sale consists of the apartment, office and other furnishings and equipment located in the building.
The grantor, a resident of Moberly for more than 30 years, lived in one of the apartments just mentioned. At the time of his death he was about 80 years of age, and hence about 78 when he made the deed and bills of sale. He had long been afflicted with an ailment described (by an M.D., who first treated him 20 years before his death) as bronchial asthma which later developed into cardiac asthma. His wife predeceased himin 1944. Their only child, Glenn, died in December, 1945, leaving a widow (Letha), but no descendants. Mr. Sibbitt appears to have been "at outs" with Letha, who was the holder of a $25,000 note made by him and secured by a deed of trust on the property in question, which note Letha had inherited from the payee, her deceased husband. Plaintiffs' evidence shows that overtures were made by or on behalf of Mr. Sibbitt looking toward a settlement of the indebtedness due Letha, and getting the note and deed of trust out of her hands, and this notwithstanding the fact that she had made no demand upon him for payment (even of interest), and her willingness and desire to continue to carry the paper for his protection. The first of these were made through Marion Lamb, an attorney, who, called as a witness for plaintiffs, testified as follows: That in August, 1946, Dr. Jolly told him (either by phone or on the street) that Mr. Sibbitt had asked that he come over to see him; that he went to Mr. Sibbitt's apartment, as requested, where he first learned of, and discussed with Mr. Sibbitt, the indebtedness due Letha; that the substance of their talk "was that he wanted me to see if I could make arrangements to pay his daughter-in-law off. He asked me to contact Mr. Austin Walden, who was his daughter-in-law's attorney, and have him find out how best he could pay off this note. As I recall, he asked me to see about making arrangements to borrow some money to pay this note off;" that he contacted Mr. Walden, who, after communicating with Letha, in due time turned over to the witness a letter from Letha (apparently in reply to one she had received from Walden), after which he "went back and talked to *843 Mr. Sibbitt about it," and then "did nothing further in the case whatever." On cross-examination the witness testified that Dr. Jolly was not present at any time he (the witness) talked to Mr. Sibbitt; that Dr. Jolly had not told him anything about what Mr. Sibbitt wanted to see him about; that Dr. Jolly neither told him what he wanted him to do, nor advised him as to how he should talk to Mr. Sibbitt.
Nothing further appears to have transpired in connection with the settlement until about a year later when, according to plaintiffs' witness Austin Walden, he (Walden), after having had a letter from Letha, got in touch with Dr. Jolly. Afterwards Dr. Jolly told him that Mr. Sibbitt wanted him to come over, and in response to that request he went to see Mr. Sibbitt sometime in August, 1947. He related the conversation. In it Sibbitt claimed the indebtedness was originally only $10,000, upon which he claimed to have paid $3700, and produced certain checks payable to Glenn, but which the witness contended probably arose out of an entirely different matter. Sibbitt indicated a willingness to settle for $10,000, but witness reminded him that the $25,000 note and deed of trust had been executed in his (Walden's) office, and that grantor had stated at that time that he was giving the note and deed of trust because he owed Glenn $25,000, and, furthermore, that he (Sibbitt) was technically in a rather bad position because he would not be allowed to testify, Glenn being dead. Witness "finally said to him, `Well, I think you ought to do something about it. Who advises you about your business affairs and things like that?' and he said, `Dr. Jolly does.' I said, `Well, if I were you, I'd talk it over with Dr. Jolly,' and after that I left." The witness never saw him after that. From then on all his conversations were with Dr. Jolly or with Mr. Motley after the latter became the doctor's attorney. This was the only time witness saw Mr. Sibbitt during the course of the settlement negotiations, and to him "he looked weak and seemed very nervous." He had known Mr. Sibbitt about 30 years, had drafted legal documents for him, and had advised him as an attorney, and thought him to be of sound mind. He replied in the negative to the question as to whether there was ever anything in his observation of Mr. Sibbitt that would lead him to believe he was not of sound mind. Witness further testified that sometime during the course of the negotiations, Dr. Jolly told him "that Mr. Sibbitt was going to deed the building to him, reserving a life estate." Also that when he informed Dr. Jolly of Letha's willingness to settle on the terms finally agreed on, Dr. Jolly said "that he was going to an osteopathic convention in Chicago, and he would take Mr. Sibbitt with him on that trip, and to let the matter stand until that trip was finished and he wanted, as I think, as he expressed it, to work on him on that trip and maybe he could get the matter settled up when he came back."
The negotiations culminated in an agreement to settle for $20,000 net to Letha, plus a fee of $1,055 to her attorney, to finance which it was necessary to obtain a new loan on the property. The President of City Bank & Trust Company of Moberly testified that Dr. Jolly applied to the bank for a loan of from $15,000 to $20,000, informing him, as president, that he expected to acquire ownership of the property. It was shown that Dr. Jolly had several discussions of this proposed loan with Mr. Walden, and also with the bank's counsel, Mr. Hulen, including the matter of his signing the note and deed of trust along with Mr. Sibbitt, in view of the impending transfer of fee title to himself with reservation of a life estate in Mr. Sibbitt. For reasons not appearing in the record, these negotiations with the bank collapsed; and, according to plaintiffs' witness, L. W. Coleman, President of First Federal Savings & Loan Association of Moberly, Dr. Jolly, sometime prior to October, 1947 (apparently after the collapse just mentioned), approached him and made oral application for a loan on the property; he did not recall how many times during the course of the negotiations he (witness) contacted Mr. Sibbitt, but he recalled the latter was present at the association's office when, jointly with Dr. Jolly, he executed a written form of loan application (dated October 27), before the signing of which Dr. Jolly had informed the *844 witness that "Mr. Sibbitt was to give him a deed to the property." The application was approved, and a loan in the sum of $16,500 made October 31, with Sibbitt and Dr. and Mrs. Jolly executing the note and deed of trust. Nothing appears in the cross-examination of this witness which aids plaintiffs' case, and inasmuch as the defendants rely on it, it will be treated in connection with the statement of the evidence on their part.
An account in the names of grantor and Dr. Jolly "as joint tenants with right of survivorship" was opened April 17, 1947, (upon the joint written application of those persons) with First Federal Savings & Loan Association by the deposit of $5,000, which was transferred from Mr. Sibbitt's account in Mechanics Bank and Trust Company by check drawn by him for that purpose. This sum was withdrawn November 1, 1947, and it, together with the proceeds of the new loan and Mr. Sibbitt's additional personal check of $1,055, was disbursed in carrying out the settlement with Letha, including expenses and the payment of certain insurance premiums.
It appears that Dr. Jolly was well and regularly paid for his professional services. He called at grantor's apartment at least once a day. On some of those occasions he would administer hypodermic injections in the patient's arm. It is fairly inferable that these were of morphine, to the use of which in obtaining relief from his asthmatic seizures Mr. Sibbitt had, in some degree, become addicted. Plaintiffs frankly concede that neither the length of time nor the frequency of such use appears. They offered no medical testimony, so that whatever showing was made by them touching grantor's physical and mental condition came from lay witnesses. Indeed, only the witness Foster, a former employe of Mr. Sibbitt, expressed the outright view that he was of unsound mind, while Mrs. Been (one of the plaintiffs) was of the opinion that (in 1948) his mental condition was "not good." However, three of plaintiffs' witnesses (Attorneys Walden and Lamb, and Coleman, the President of First Federal Savings & Loan) gave it as their opinion (on cross-examination) that he was of sound mind.
It is principally the testimony of Foster that is relied on to show grantor's weakened and impaired mental faculties, particularly as to the effects attributed to the patient's use of morphine. For this reason we set out his testimony in some detail.
Foster testified that after Glenn's death, he stayed with Mr. Sibbitt at intervals, but his testimony in fixing those times is contradictory and confusing. He thought it was from the time that Glenn died (December, 1945) until in May, 1947, that he "stayed practically all the time. Of course, I was in and out all the time." It is quite clear that he was not there regularly for six months prior to the transaction under scrutiny, although he did "drop in once in a while." He fixed the frequency of Dr. Jolly's visits as "three trips nearly every day and I've knowed him to make as high as five, * * * one at about 6 o'clock of a morning, and then one about noon, and then about 5 o'clock in the afternoon." Asked how long the doctor would usually be there, the witness answered, "Oh, from two to three minutes." Concerning grantor's condition during the time he stayed with him, the witness testified as follows. "Well, he wasn't hisself only about two or three hours a day. He'd be at hisself. He was doped all the time. * * * I've picked him up off the floor dozens of times where he'd be down on the floor with a fly swatter chasing mice or cockroaches and trying to set the dog on them, and there wouldn't be a sign of them there, but he'd chase them all around over the floor." He stated that in 1947 Mr. Sibbitt "was sick all the time. Sometimes he couldn't be up hardly. Other times he'd straighten up and he'd be in pretty good shape and get downstairs and mess around;" that while he was staying there it was frequently necessary for him to call Dr. Jolly to come over"he would just get so crazy for dope he just had to have it, and I'd have to call Dr. Jolly to come and give him a shot. * * * When I'd go call the doctor I've seen him pull his sleeve up that way and hold that arm up;" that when the doctor *845 came all he would do would be to give him a shot. The witness also testified that Dr. Jolly told him that he had several times given Mr. Sibbitt injections of twilight sleep through errorand with unconventional, if not baffling, effects. He also testified that grantor gave his deceased wife's "very large solitaire diamond ring" to Dr. Jolly"Said he had to, said he had to be good to Jolly. Said Jolly was the only man that would give him as much morphine as he wanted. He had to get that morphine." He further testified to these statements of grantor in reference to the transfer of his car to Dr. Jolly: "Yes, I went over there one night and Mr. Sibbitt said, I sold my car today.' I says, `Who'd you sell it to?' He says, `Well, really, I give it away.' Says, `I sold it to Dr. Jolly and took his note, but he'll never pay it.' Says, `His old Buick give out and he had to have some way to go.' Says, `Just as well give it to him. He'll never pay it.'" Notwithstanding these disclosures touching Dr. Jolly's acquisition of such items of personal property, the witness stated that he had no conversation with Mr. Sibbitt "concerning the deeding of this property to Dr. Jolly and his wife." He further testified that "sometime around August or October, 1947," Dr. Jolly came to the apartment "and got Mr. Sibbitt to take him over to town to transact some business," and before doing so gave him a shot; that Dr. Jolly and Sibbitt went over to the First Federal Savings & Loan Association on Williams Street, and he saw them go in; that he was interested in Mr. Sibbitt and he thought Dr. Jolly was mistreating him, and that he followed them to the First Federal's office because he knew that Dr. Jolly was trying to work something out of him, and he was going to find out where they went. He thought Mr. Sibbitt was of unsound mind at the time of the making of the deed, and didn't know what he was doing; that he was crazy practically all the time; "at times he'd come to hisself, he'd know what he was doing, but the majority of the time he didn't know what he was doing."
Plaintiff, Mrs. Been, who resides in Delphi, Indiana, testified that she visited her uncle, the grantor, for about a week in January, 1946, immediately following the death of his son, Glenn; that she met Dr. Jolly at that time; that, as she remembered it, he called twice a daya couple of times late at night; that on those occasions "he'd just give him a shotan injection in the armthen leave;" that grantor's "physical condition was very, very bad. He was just about the thinnest person I think I ever did see." During that same visit, in discussing the gift of the ring to Dr. Jolly, her uncle told her that because he was so dependent on his treatment, he felt he had to do extra things for Dr. Jolly to keep on getting it. Asked if she had not stated while here in 1946 that her uncle had offered to deed the building to her if she would come to Moberly and take care of him, the witness answered that while she did not recall saying just that, it was possible she may have done so, adding "but, as a matter of fact, he did say that if I could stay with him, he'd make me independent for life." However, her situation was such that she could not accept his offer because she could not leave her aged mother, her son who had returned from the service, and her husband, and she so informed her uncle. She testified that in the summer of 1948 she again visited grantor at his home, and during that visit, in discussing the deed in question, he stated "that he didn't want to do it, but he couldn't see any other way out of it; that he was forced into it." She was there two nights and one day on that visit, but did not suggest to him that he take legal steps to set it aside. She was of the opinion that in 1948 his mental condition was "not good." This was based upon "the fact he was constantly taking morphine" (as she expressed it), and upon a conversation respecting the division made in 1918 of his mother's estate, in which he stated that the witness and her sister (the co-plaintiff, Mrs. Moyer) and his son Glenn had each gotten 110 acres of Indiana land, whereas, in fact, the witness and her sister had gotten only 59 acres. On cross-examination it was developed that on the occasions of her visits her uncle was able to, and did go downstairs; that he read the newspapers, had the National Geographic and Reader's Digest, and discussed current *846 events and magazine articles with her; that "he had a high school education and some educationabout 2 yearsat DePauw University;" that in the last few years she had corresponded with Mr. Sibbitt and he had sent her family pictures and a collection of rare birds and other things; that when she was here in 1948, his condition had "entirely changed" from what it had been in 1946, in that he seemed depressed; that in 1948 "it was pretty bad," although he did not seem to be coughing any more than previously. Asked as to his traits of stubbornness and self-will, she answered, "He was a stubborn and selfwilled man except where Dr. Jolly was concerned." The two visits, one for a week and the other for two nights and a day in 1946 and 1948, respectively, were the only times she had seen her uncle in 15 years.
The sum and substance of the testimony of the other plaintiff, Mrs. Moyer, was that one evening in July, 1946, she stopped off on a cross-country motor trip, and visited for an hour or two with her uncle, the grantor, in Moberly. She was not asked concerning his condition then, or at any other time, nor any other relevant fact.
The nature of plaintiffs' proof, and some of the implications arising from it would seem to require that defendants' evidence, voluminous as it is, be stated in similar detail. We turn first to such of the testimony as relates to the facts and circumstances immediately surrounding the procuring and execution of the instruments, as given by the witnesses Motley, Wisdom and Coleman.
The warranty deed, the $16,500 note and the deed of trust (but not the bills of sale) were executed in the law office of Hunter, Chamier & Motley on the afternoon of October 31, the matter being handled by Mr. Motley, who had previously been furnished with the note by First Federal Savings & Loan and instructed by Mr. Coleman, its President, to prepare the deed of trust and warranty deed. But Mr. Motley had also been consulted by Dr. Jolly (apparently before being retained by First Federal) in reference to the matter, and particularly the terms of the loan as proposed by City Bank & Trust Co. From Mr. Motley's testimony it appears that on the morning of October 31, Dr. Jolly came to their office and inquired if the papers would be ready that afternoon, stating that if they would be, he and Mrs. Jolly and Mr. Sibbitt would come in and sign them. An appointment for that afternoon was arranged, and at 1:30 or 2 o'clock Mr. Sibbitt and Dr. and Mrs. Jolly arrived at the office. They were escorted into the library where, with Mr. Motley, all were seated at a table, and the documents were brought in by Miss Wisdom. Mr. Motley related that preliminary to the signing of the instruments, there was a general discussion. One thing he recalled in that connection was that Mr. Sibbitt related that he and his father had lived during the lifetime of every President. This was the first time he had seen Mr. Sibbitt. He described him as being a tall, thin man, who seemed to have difficulty in getting his breath, and who, as he thought, was carrying a cane. He recalled that Mr. Sibbitt was concerned about his little dog running in and out of the library.
The following excerpts are taken from Mr. Motley's testimony in reference to what transpired:
"A. Before I referred to the papers, I told Mr. Sibbitt I had had some discussion with Mr. Coleman and that I understood that Mr. Sibbitt was to make a deed to the property to Dr. Jolly and his wife; that he would keep the property for his lifetime and be entitled to the rents from the building during the time that he was living and that at his death the property would be owned by Dr. Jolly and his wife. I told him that I further understood from Mr. Coleman that in order to satisfy an indebtedness which Letha Sibbitt had, that is, the deed of trust, that it was necessary to borrow some money to pay it off. As I understood, the First Federal Savings & Loan Association was making a loan of $16,500 and that in order for the First Federal to loan that money that it would be necessary after the conveyance had been made to Dr. Jolly and his wife for the three of them, Mr. Sibbitt, Dr. Jolly and Mrs. *847 Jolly, to execute a deed of trust on the building.
"Q. And sign the note, too? A. Yes, and I asked Mr. Sibbitt and Dr. Jolly and his wife, all three of them, if I had the understanding of the matter correctly. They said that that was correct. Every one of them said that. The next thing that I recall doing was taking the warranty deed which Mr. Sibbitt was to sign, went over the deed in detail with Mr. Sibbitt. As I recall, I read most all of it to him. Perhaps some of the printed part I didn't read. I read practically all of the typewritten matter into it and explained to Mr. Sibbit that if he signed the deed that so long as he lived that he would be entitled to the rents and profits from the building by virtue of having reserved the life estate. I further told him that if he signed the deed that when he died that the property would pass to Dr. Jolly and his wife, that neither he nor any of his heirs or anyone else would have claim to the property and I asked Mr. Sibbitt if he fully understood it. He said he did, that that is what he wanted done. Some time during the course of the afternoon, I won't say whether it was right at the time I was explaining the deed or maybe the deed of trust, but I asked him in connection with each instrument if that's what he wanted done and if he understood it. He said he did. During the course of the afternoon he stated he wanted Dr. Jolly and his wife to have the property, that they had been good to him, that they had done things for him and he wanted to keep the property so long as he lived. He had to have some income, but upon his death he wanted the property to go to Dr. Jolly and his wife.
"Q. After this explanation of these papers was made just state to the court what took place. A. Well then after the deed had been signed then I next took up the note which they were to sign. I held the note up and showed it to them, read the note and I explained that it was to be signed by all three of them. I explained to them that by signing the note they would become personally liable, that each of them individually would be liable for the total amount of the note. They all stated that they understood that. I told them that the next instrument to be executed was the deed of trust to secure the note. The deed of trust was explained to Mr. Sibbitt, to Dr. and Mrs. Jolly and I told them why the First Federal was wanting or demanding, you might say, a deed of trust as security for the loan of $16,500 which they were making in this case."
The witness further testified that Mr. Sibbitt complained about the $1,055 fee to Letha's attorneys and was displeased about it; also that through error, and while he and Miss Wisdom were temporarily absent from the room, Dr. and Mrs. Jolly signed the warranty deed, and upon that fact being discovered, lines were drawn through their signatures. He further testified that after the instruments mentioned were signed, Mr. Sibbitt himself brought up the matter of conveying the personal property, but at that time a bill of sale had not yet been prepared, but it was agreed that Mr. Motley would draw one and send it to Dr. Jolly's office that afternoon, and the parties left. A bill of sale was prepared, but it conveyed only refrigerators and gas stoves, the serial numbers of which had some days previously been furnished to Mr. Motley by Dr. Jolly. Upon receiving such bill of sale, Dr. Jolly called back and stated that Mr. Sibbitt had a lot of other personal property over in the building which had not been included, so it was decided to draw the second bill of sale here involved, which has been referred to as one general in character. It was drawn and delivered to Dr. Jolly's office later that afternoon. Proof of the execution of these two bills of sale does not appear otherwise than by their own acknowledgments. The witness stated that while it was the first time he had seen Mr. Sibbitt to know him, "there was nothing about his appearance or the way he talked that led me to have any suspicion whatever about him."
On cross-examination he stated he supposed he was representing both Dr. Jolly *848 and the First Federal Savings & Loan, and explained the facts in that connection at length; that while he definitely remembered Mr. Coleman told him about the fact that a deed was going to be made from Mr. Sibbitt to Dr. and Mrs. Jolly, he was nevertheless under he impression that Dr. Jolly also mentioned that fact to him, and probably inquired about it on the morning he arranged for the appointment for executing the instruments. Asked if it was his customary practice to go into such detail (as testified on direct) in having papers of similar kinds executed in his office, witness replied:
"A. As a lawyer I follow that practice, Mr. Hulen, because I think it's the duty of any attorney to fully explain to any people that come to his office to sign papers, to see that they fully understand what they're signing and I've heard of instances of people saying they didn't understand what paper they signed. Since I have been in the office I have worked very closely with Mr. Chamier and I know that's one thing he has taught me to do, to be sure in any case that I fully explain to people so that they understand, that you couldn't be too cautious in any case of people understanding what they're signing.
"Q. Was there anything about this particular transfer itself that caused you to be exceedingly cautious in this particular? A. No, I don't know that there was.
"Q. You knew that Dr. Jolly wasn't paying anything for this property, didn't you? A. I knew that he wasn't paying anything, any cash out of his own pocket. That was my understanding."
Miss Wisdom testified she was present and as a notary public took the acknowledgments of the deeds; that Mr. Motley "picked up the warranty deed first and put it in front of Mr. Sibbitt and showed him where to sign and told him it was a deed conveying the property to Dr. Jolly and his wife and I believe that Mr. Sibbitt said that he wanted to be sure he had reserved a life estate, and Mr. Motley assured him he had, and I think probably read it to him and showed him where it was, and then Mr. Sibbitt signed." After explaining the circumstances connected with the erroneously affixed signatures of Dr. and Mrs. Jolly on the deed, the testimony of the witness proceeds thus: "Then Mr. Motley handed the note and deed of trust to Mr. Sibbitt and he signed, so, of course, did Dr. and Mrs. Jolly, and I asked them all if it was their free act and deed and they said yes, and I think that was about all that happened while I was in there." The witness had known Mr. Sibbitt a good many years, 20 or more, and he had been in the office on prior occasions to execute instruments. Comparing his appearance on the occasion in question and in former years, witness stated, "Of course, he was older, but I didn't see any difference, seemed to be the same to me."
Plaintiffs' witness Coleman, President of First Federal Savings & Loan Association, testified thus on cross-examination: That he had known Mr. Sibbitt since 1918; that on October 27, 1947, Mr. Sibbitt and Dr. Jolly came to the office and signed the loan application which had previously been given them; they were there 20 to 30 minutes; that Mr. Sibbitt read the application and "everything was analyzed and gone over before he signed it. * * * I was careful to see that he did understand it; that at that time there was a discussion about the execution of the deed to Dr. and Mrs. Jolly, reserving in Mr. Sibbitt a life estate; that Mr. Sibbitt "agreed that that was the way title was to be taken;" that there was a discussion to the effect that Mr. Sibbitt, Dr. Jolly and his wife would execute the $16,500 note and the deed of trust securing it, and Mr. Sibbitt so understood, and "stated that the entire transaction met with his approval, and was what he wanted done;" that Dr. Jolly did not say anything to Mr. Sibbitt to encourage him to sign the application; that on November 1, 1947, Mr. Sibbitt and Dr. Jolly came to the office and signed an application to withdraw $5,000 from their account; that "from 1918 on," based on his contacts with and observations of Mr. Sibbitt, he "had no reason to think *849 otherwise than that he was sound in every way; that in May, 1948, Mr. Sibbitt reported to the witness a windstorm loss he had on the building, after, which he received from Mr. Sibbitt proofs of loss in connection with his claim.
The appraiser for the Savings & Loan Association, W. Sims Haynes, testified that when he made an inspection of the building in late October, 1947, he found Mr. Sibbitt at the heating plant of the building doing some kind of work thereon, and asked that he go over the building with him, and give him certain information; that they went all over the building together, and spent about 2 or 2½ hours doing so; witness inquired of him as to rental rates, taxes, coal and water bills, amount of insurance carried and premiums thereon; they discussed a small strip (10x20) behind the building where the title was in question; witness found it fenced, and Mr. Sibbitt stated he finally got it under fence, and he was trying to establish ownership of it; that he was cooperative in furnishing the requested information, some of which he varified by "spot checks," and found it accurate; that witness did not see Dr. Jolly at the building, nor did the doctor talk to him about the appraisal"I had no dealings with Dr. Jolly at all." Witness had known Mr. Sibbitt since about 1920, and in his opinion he was of sound mind.
H. C. Griffiths, M. D., a graduate of University of Missouri, and St. Louis University, practicing at Moberly since his graduation in 1927, was the only medical witness in the case. He had not only been Mr. Sibbitt's physician at intervals, but also his former tenant, having (when first married) occupied one of the apartments in the late 1920's. He testified that when living in the apartment he treated Mr. Sibbitt for asthma (then bronchial, later developing into cardiac, as previously stated); that he knew of no one else who treated him during "that strip of years, '28, '29, or '30, right in that period;" that he "used to give him shots of adrenalin and epinephrine and that would relieve him;" that during the later years it took morphine to relieve him (by relaxing the bronchials); that three or four times during such later years, when Dr. Jolly was not available, he was called in and "had to give him a shot." He stated that during the 20 years he had known Mr. Sibbitt, it never occurred to him that he was of unsound mind. The cross-examination was largely devoted to hypothetical situations involving the use of morphine, such as whether the person who administers it does not have an unusual influence over the addict. Asked if such would not be his professional opinion, the witness answered, "Well, in an ordinary case I think it would be. In the case you are talking about [Mr. Sibbitt], he was such a hard head I can't figure anybody influencing him." On redirect-examination the witness stated he had never seen Mr. Sibbitt in any such state as that hypothesized on cross-examination with respect to an addict being completely under the control of morphine. However, he said that in 1947 or 1948 when Mr. Sibbitt was in McCormick Hospital suffering from a bad attack, he was called in to see him; that he went in and examined him, "but he was still old hard headed Sibbitt.
"Q. But if he had been given morphine it hadn't been given to such an extent that at that time, in 1948, he wasn't of sound mind and strong mentally? A. He knew me and talked to me like you would expect a man to. He was weak, but he knew everybody.
"Q. You say he was of sound mind at that time? A. Yes.
"Q. If he had received morphine, in your opinion as a physician, had that morphine made him mentally weak or wasn't himself? A. No."
Numerous original exhibits in the case (about 100) have been brought up, including dozens of checks, memoranda, account books and other items in Mr. Sibbitt's own handwriting, showing a very detailed and businesslike record of his business transactions. This memorandum (in his handwriting) appears in the account book: "Mch 1st 1949 Dr. Jolly has locked up in safe in McCormack Hospital 3 $100 bills & 5 $20 bills, total $400.00 this is reserved to pay my funeral expenses, is rolled in small glass tube & covered with paper in trust A. C. Sibbitt."
*850 It appears that Mr. Sibbitt devoted much of his time to reading. The publications which he read regularly and to which he subscribed were identified by several witnesses as National Geographic (life subscription), Time Magazine, Reader's Digest, St. Louis Globe-Democrat, Moberly Monitor-Indexand magazines purchased at news-stands, such as Popular Mechanics.
Clarence Riebel and his wife, Dorothy, testified for defendants. The husband conducted his Chrysler agency in one of the storerooms from 1938 to 1947 or 1948, except 1942-1945 when he was in military service. He and his wife were also tenants in one of the apartments from June, 1945, until the latter part of 1948. He paid his rent regularly and directly to Mr. Sibbitt, whom he described as being "strictly business." He further testified that in 1946 Chrysler Corporation made certain requirements with respect to improvements in the agency's plant facilities, which proposals he discussed with Mr. Sibbitt, who objected, and refused to permit the use of as much room as would be required, thus forcing the witness either to buy or move. He then made a purchase offer of $30,000, and was told to go to Kansas City and see Letha, which he did, but in the meantime another location became available, and he "grabbed it, and slipped out." Witness considered Mr. Sibbitt as "very businesslike and sound in every waytook care of his own business; * * * he was a sort of cranky old fellow who wanted everything his own way, and it had to go that way or he wasn't satisfied. He wanted his money when it was due, and he wouldn't give you no time on it." He testified that Mr. Sibbitt stated to him on more than one occasion that Dr. Jolly and Mrs. Riebel (witness' wife) "was the only ones ever cared anything about him;" that he made an offer to purchase his car, but Mr. Sibbitt "said he had promised to sell it to Dr. Jolly in case he wanted to get rid of it, so Dr. Jolly bought the car and gave him whatever I offered for it. Cars were scarce at the time * * *. He said Dr. Jolly needed the car for service and he had to call on him all hours of the night, * * * and that he had been good to him, and he thought he should have the automobile."
On cross-examination witness stated that Mr. Sibbitt had not offered to deed his property to Mrs. Riebel; that he was never present when Dr. Jolly administered any treatment to Mr. Sibbitt, but he knew that any time Mr. Sibbitt called the doctor he would come, and that at times Mrs. Riebel did such calling.
John Haller ran a liquor store in one of the storerooms of the Sibbitt Building, commencing in February, 1947. He testified that sometimes Mr. Sibbitt would come to the store to collect the rent, and sometimes the witness would take it up to his apartment; that every day or two Mr. Sibbitt would come to the store and buy chewing tobacco, and about once a month he would buy a fifth of whiskey, and always paid for his purchases at the time he made them; that in the spring of 1948 he complained to Mr. Sibbitt about a cracked window in his place of business and inquired about getting it fixed, to which Mr. Sibbitt replied that "he [the witness] would have to see Dr. Jolly about that, that he gave that building to Dr. Jolly, he was glad to get rid of it." He further testified that in the early part of 1949, in a conversation with Mr. Sibbitt with reference to delivering merchandise to his apartment, he suggested that any time he needed anything, he would either bring it up himself or send it up by Dr. Jolly, as the latter usually came by the store enroute to the apartment; that Mr. Sibbitt said, "No," that he would either come get it himself or call the witness; "that Dr. Jolly had been so nice to him he didn't want to impose upon him any more, that he'd call me or else come down and get it himself." This witness expressed the opinion that Mr. Sibbitt was of sound mind at all times up to a period of approximately ninety days before his death in September, 1949. On several occasions he saw Dr. Jolly carrying food to the Sibbitt apartment, but he did not know where he got it. There was a restaurant across the street from the building. The doctor usually came twice a day"early in the morning and late in the evening."
*851 "Kitchen Cooked Products" occupied one of the storerooms, and from March, 1947, to early in 1949 the owner (Rainey) lived in one of the apartments. The rent paying dates on the two spaces were, respectively, the 1st and the 15th of each month, at which times he customarily saw Mr. Sibbitt at his apartment, and, from time to time, he also saw him on the street; that every time he went up to the apartment to pay his rent he found Mr. Sibbitt looking at something, mostly papersreading; that Mr. Sibbitt would come into witness' place of business, and make small purchases (of edibles), always paying cash; that sometimes he would discuss bargains he had purchased in sales at the stores; that after Mr. Sibbitt was taken to Macon (three months before his death), he (witness) called Dr. Jolly and asked him to whom the rent should be paid, "and he told me just to pay it to him." In his opinion, Mr. Sibbitt "was of sound mind very much." On cross-examination he stated that Mr. Sibbitt "was a thin man like I am. That's all I know. I mean, just looked weak." He saw Dr. Jolly there once a day at least, but did not know for what he was treating him.
Everett Davison, another tenant, occupying both business (plumbing shop) and apartment space, testified that his tenancy commenced in March, 1948; that thereafter he took care of the furnace, and of the halls and back porches, and did general plumbing repair work for Mr. Sibbitt; that the latter was familiar with the building and the piping in it, and accompanied the witness and showed him where to shut the water off, and that he would either stay there with him or go back to his apartment. He was of the opinion that Mr. Sibbitt was of sound mind up to within two or three months before his death. On cross-examination the witness stated he knew Dr. Jolly was Mr. Sibbitt's physician and saw him there "on occasions;" that he rented the shop in 1948 from Mr. Sibbitt but that Dr. Jolly was present at the time. He had previously asked Dr. Jolly about the matter.
Herman Kidd, an insurance agent, testified that he called on Mr. Sibbitt at his apartment in July, 1947, to solicit insurance on the building in question. It appears from his testimony that Mr. Sibbitt was having trouble with his insurance, some of it having been cancelled; he went over the matter with the witness in some detail, showing him several policies (some lapsed, some cancelled, and at least one which was still in force); he had been carrying $10,000 in four policies of $2,500 each, "he had them arranged to renew once a year." As a result of their conversation, the witness caused the building to be inspected by his company's state agent, but the risk was turned down, and this fact the witness reported to Mr. Sibbitt, whose position seemed to be "like anyone else, I guess, if they didn't want to insure his property it was all right with himseemed to take that attitude." Witness did not at any time discuss this matter with Dr. Jolly, nor was he present at either of his conversations with Mr. Sibbitt about it. He stated that Mr. Sibbitt "appeared to be familiar with the status of the insurance on his building at the time," and that "he seemed of sound mind to me."
Bert Kunzler, a barber, for many years occupied both shop space and a sleeping room as Mr. Sibbitt's tenant. He testified that in paying his rent Mr. Sibbitt always gave him a receipt; that, except for the period from 1941 to 1945 while he was in the military service, he did Mr. Sibbitt's barbering from 1936 until he passed away; that he shaved him approximately three times a week; "in pretty weather, he always came to the shop; if it was raining I went to his room;" that he spent a lot of time with him when he would go up to shave him or on Sundays when he would visit with him; that "Mr. Sibbitt was a great hand to read, and since the war the atomic bomb and diesel power was two things that he studied a lot. He read articles in magazines on that," which he marked, exhibited and discussed with witness; that "any time you went to his apartment, if it wasn't his meal time, Mr. Sibbitt was usually reading a paper or magazine." The witness was of the opinion that Mr. Sibbitt was of sound mind during the entire period from 1936 down to the last time he saw him. He *852 also stated that Dr. Jolly usually brought Mr. Sibbitt's noon meal"Mr. Sibbitt was very prompt about his noon meal. He wanted it at 12 o'clock." On cross-examination he stated that the doctor's practice of bringing in the noon meal extended over "the last several months" [of his life?]; that he had been in Mr. Sibbitt's room when Dr. Jolly would be there, or came with his lunch, but never when an injection in the arm was given.
Dorothy (Mrs. Clarence) Riebel testified that from January, 1946, to December, 1948, she served meals to Mr. Sibbitt which she prepared in her own apartment. The arrangement was first limited to the noon meal, which was always hearty. Later she fixed his breakfast coffee, and, occasionally bacon and eggs. He liked a light evening meal (such as milk toast, soup, or crackers and milk), which he usually prepared himself, unless he was feeling badly. Witness did not see a great deal of difference in his physical condition during the period mentioned. He would quite often call her to his room at night when he couldn't get his breath, and she would minister to him; after she saw the first such attack, she did not ask what was the matter, but would call Dr. Jolly. She described Mr. Sibbitt as being "fairly active" when they moved into the building; that he made trips downstairs, and liked to get out and have a little air, took his little dog for a walk, came down to their place of business and sat; that he would ask witness to drive him to town, or to the cemetery; they frequently took drives in the afternoon for fresh air; on such occasions she took him to the bank, J. C. Penney's, and on similar errands; saw him write out rent receipts; she made bank deposits on slips made out by him.
Witness further testified that on December 2, 1947, upon her return home after an absence while hospitalized, Mr. Sibbitt came to see her, and that in the course of their conversation "he mentioned the fact that he and Doc Jolly had done a little dealing. I said, `Is that so' and he said `Yes, we have kinda got together on a few things.' He says, `Of course, it really doesn't amount to anything.' Said, `Doc is going to take over the building.' I said, `Well, that's fine, Mr. Sibbitt.' He said, `Well, of course there really won't be anything about this that will take place as long as I live. Things will go on just the same.' He said, `That has been the agreement between Dr. Jolly and myself.'" During the same conversation, he also said, "I've finally paid Letha off. It's a worry I'm glad to get off my mind." In this connection, she stated his attitude seemed to be that he "was a little put out about Letha;" he would not accept her letters. Witness recalled that Letha once sent him pajamas, which he refused to accept, and threw them out the window. She described him "as a man who seemed apparently to enjoy life, however at the same time he liked to have his own way. * * * He was a little stubborn. People didn't usually ask him why he did anything, they just merely took it as a matter of fact that is what he wanted to do. There may be some question that he was hard to get along with. I never had a cross word with Mr. Sibbitt since I have known him. He was good to me."
Witness further testified that Mr. Sibbitt "seemed to think quite a lot of Mrs. Been," and he also mentioned Mrs. Moyer; that on the occasion of Mrs. Been's 1946 visit he stated he had offered "to make her independent for life if she would come and take care of him and stay with him," but that she had to decline because she couldn't "go away from home and leave her husband and her son."
Witness further testified that either shortly before or shortly after she moved away from the Sibbitt Building, Mr. Sibbitt gave her a bottle which contained a ring or rings, and on which bottle there was written in his own handwriting, "For Mrs. C. E. Riebel, who has sure been wonderfully good to me. I don't think there's another living woman like her. Give to Dorothy the contents of the package. A. C. Sibbitt to Dr. Jolly, D. O." The character and value of such ring or rings (the record uses the singular form in some places and the plural in others) was not developed.
*853 Witness thought Mr. Sibbitt to be of sound mind until the time she last saw him about 10 days before his death in the hospital at Macon.
Cross-examination: Dr. Jolly would call upon Mr. Sibbitt about three times a day, and oftener, if requested; that when he came at night he would usually administer an injection, which she understood from the doctor to be morphine, and that the patient would usually "show some revival" within thirty minutes, but she denied the doctor administered such hypodermics unless the patient was having an asthmatic attack. Witness knew the doctor had received the diamond ring mentioned by the witness Foster, and also that he had acquired the automobile mentioned by that witness, and which her husband had attempted to purchase. The following appears in relation to the matter of her compensation:
"Q. Now, Mrs. Riebel, did Mr. Sibbitt ever offer to deed this property to you? A. No, sir, he didn't.
"Q. Did he ever pay you for all these wonderful services you rendered to him? A. Only in kindness and small gifts."
Frances Ellis, another tenant (since 1944), followed the practice of the others in always paying her monthly rent to Mr. Sibbitt at his apartment, and receiving from him rent receipts in his own handwriting. She expressed the opinion that he was of sound mind.
Hilda Kirkland, a lifetime resident of Moberly, and formerly in the employ of Dr. Jolly (middle of 1939 through 1941) as a stenographer, testified to the frequent visits by Mr. and Mrs. Sibbitt to Dr. Jolly's office, upon which occasions she would talk to them; that on more than one occasion both of them "expressed their very warm regard for Dr. Jolly and confidence in his professional ability, * * * and that having to call a doctor any hour of the day or night it was so good to know that they could depend on doctor * * *. I would have been totally unobserving had I not seen the deep confidence and respect they had in doctor and his interest and concern in them." Witness further testified that Mr. Sibbitt was very intelligent and alert mentally, and, in her opinion, he was of sound mind.
Dr. and Mrs. Jolly were offered as witnesses, but upon plaintiffs' objection that they were incompetent under the dead man's statute, RSMo 1949, § 491.010, VAMS, they were not permitted to testify.
Appeals in equity cases such as this are heard de novo on the record as made below, the reviewing court determining the weight and value of the evidence, but usually deferring to the findings of the chancellor, especially where there is conflicting oral testimony involving credibility of witnesses, except when convinced that such findings are against the weight of the evidence. Ulrich v. Zimmerman, 349 Mo. 772, 781, 163 S.W.2d 567, 571. Applying that practice to the case at bar, and without further summarization or review of the proof touching the issue of mental incompetency, it is manifest that the evidence overwhelmingly supports the trial court's finding that "Mr. Sibbitt was of sound mind at all times until shortly before his death in 1949." No other conclusion could be supported under this record. Indeed, mental incompetency, as a separate and independent ground for invalidation, seems to have been substantially, if not entirely, abandoned by plaintiffs, thus really leaving as the only live issue that of undue influence.
"`Undue influence, which is sufficient to warrant a court in holding a will or a deed invalid, must be such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another.' Shaw v. Butler, supra [Mo.], 78 S.W.2d 420, 428; Patton v. Shelton, 328 Mo. 631, 40 S.W.2d 706, 714; Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S.W. 46, 51. There must be proof of such undue influence, either in fact or presumptively." Hamilton v. Steininger, 350 Mo. 698, 713, 168 S.W.2d 59, 67.
The court found the existence of a confidential relationship between Mr. Sibbitt and Dr. Jolly as a fact, plus activity on *854 the part of the latter in procuring the execution of the instruments in question, and concluded that such facts created a presumption of undue influence, thereby making a prima facie case for plaintiffs under such authorities as Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772; Hamilton v. Steininger, supra, and Horn v. Owens, Mo., 171 S.W.2d 585. Plaintiffs' complaint is that after having properly so ruled, the court nevertheless (and in violation of the rule of those cases) "erroneously concluded that the burden remained with plaintiffs to show undue influence," and that "defendants wholly failed to carry the burden to disprove the presumption of undue influence."
When such presumption arises, the burden of evidence shifts to the grantee "to show the transaction was fair and equitable." Nelson v. Hammett, Mo., 189 S.W.2d 238, 243. It is there carefully pointed out that the burden thus cast upon the grantee is not the burden of proof in its strict sense (i. e., that of establishing the affirmative of the ultimate issue, which never shifts throughout the trial but remains upon the party asserting it), but is that "of going foreward with the evidence, a burden of meeting a prima facie case, a burden of explanation of the facts and circumstances attending the transaction to show that there was no fraud, overreaching or undue influence practiced * * *. The facts giving rise to the presumption * * * and all inferences arising therefrom, would not disappear upon the admission of rebuttal evidence, but would remain in the case to make an issue of fact and be weighed with the whole evidence in determining the issue of undue influence." Other cases dealing with the presumption, and its attendant shifting of the burden to the grantee have said: "But the presumption is rebuttable and it may be shown that the grant was not the result of undue influence, but was the voluntary act of the grantor." Horn v. Owens, supra, 171 S.W.2d loc. cit. 592. Such "presumption may be overcome by evidence showing that the deed in fact expressed the wish of the grantor and was the result of voluntary action." Hamilton v. Steininger, supra, 350 Mo. loc. cit. 715, 168 S.W.2d loc. cit. 69. The burden is that of disproving undue influence. Holland v. Anderson, Mo., 196 S.W.2d 175, 192.
This is the sort of transaction which the courts scrutinize with great severity, a precept to which the trial court and this court on appeal have sought to rigorously adhere in adjudicating the controversy. Here the grantor is dead, and for that reason the lips of the grantees are sealed, so that in rebutting the presumption, if it arose, defendants' proof was confined in large measure to circumstantial facts, to develop which the trial court properly permitted a wide range of inquiry.
Being a fact case, they have been purposely set forth at great length. From them it abundantly appears that grantor was stubborn and unyielding in nature and disposition; he was able to, and did carry on his business, of which he kept minute and accurate records; he had no kin except collaterals; his feelings toward Dr. Jolly were most friendly and cordial; he had a deep sense of gratitude for the latter's professional and other ministrations and kindnesses extending over the years; that he understood the nature and effect of the instruments, including the reservation of a life estate in himself. The trial court attributed the statement of Mr. Sibbitt to his niece, Mrs. Been (in which he expressed dissatisfaction with the conveyances) as having been "made in a self-serving way to avoid further discussion of the matter." Although the conveyances were made almost two years before his death, there is no other evidence of dissatisfaction on his part in having made them. We concur in the trial court's view in that connection. All of these things are satisfying and, taken collectively, convince us, as they did the trial court, that the instruments were not executed as the result of undue influence. On the contrary, it is apparent that they express the desire of the grantor, and being his voluntary acts, should be given effect. The judgment is affirmed.
All concur.