Edna M. CUTHBERT, Executrix of the Estate of Mabel S. Adams, Deceased, Respondent,

v.

Arthur H. HEIDSIECK, Appellant.

No. 49137.

Supreme Court of Missouri,

Division No. 2.

Feb. 11, 1963.

Edward J. Houlihan, St. Louis, for appellant.

John B. Sharpe and Jesse E. Bishop, St. Louis, for respondent.

BOHLING, Commissioner.

This is a suit to set aside a gift made December 16, 1959, by Mabel S. Adams to Arthur H. Heidsieck, Mrs. Adams' attorney, of two hundred shares of United States Steel Corporation common stock on the ground of undue influence practiced by said attorney upon said client. We have appellate jurisdiction because of the amount in dispute. Mrs. Edna M. Cuthbert was appointed Guardian of the Estate of Mabel S. Adams, Incompetent, on September 26, 1960. She filed this suit January 25, 1961, as such guardian. A trial resulted in a decree and judgment for the plaintiff, the trial court retaining jurisdiction so far as necessary to effectuate said decree and judgment. Mrs. Adams died pending defendant's appeal, and plaintiff, as Executrix of the Estate of Mabel S. Adams, Deceased, has been substituted as party respondent.

Under plaintiff's petition and defendant's answer the following facts stand admitted: Plaintiff's capacity as guardian aforesaid. Mrs. Adams' ownership on or about December 16, 1959, of the 200 shares of United States Steel Corporation stock. Defendant, for a long time prior to December 16, 1959, was the trusted lawyer, financial advisor and confidant of Mrs. Adams and a fiduciary and confidential relationship existed between them. Mrs. Adams on December 16, 1959, transferred said stock to defendant as a gift. These admissions were offered in evidence.

Defendant's answer put in issue the other material allegations of plaintiff's petition, i. e.: That Mrs. Adams on December 16, 1959, (1) "possessed failing eyesight"; (2)

"was physically in failing and infirm health"; (3) "was in a state of declining mental vigor" and (4) "was easily persuaded by those trusted by her in the handling of her financial and personal affairs"; and that, in breach of the fiduciary and confidential relationship then existing between them, defendant exercised undue influence, coercion and deception upon Mrs. Adams in procuring her gift of said stock to him without consideration.

Mrs. Mabel S. Adams, born January 2, 1880, was the wife of Lloyd L. Adams, a practicing lawyer of St. Louis city, who died in November, 1943. She continued to reside in St. Louis. She broke her hip January 31, 1960, was taken to a hospital, was there six weeks when she broke her other hip and fractured a wrist. She died January 23, 1962, without returning home. She was 80 years old January 2, 1960, a small, thin, active woman. Others of her age could not keep up with her. She had only four or five women friends. We briefly outline Mrs. Adams' activity prior to the breaking of her hip: She had been working for about 10 years for Louis Brooks, a lawyer, as a receptionist, answering the telephone and making notes, after 12:30 p. m. on Mondays, Wednesdays and Fridays. She could not typewrite. She had her evening meals at Hulling's Restaurant, 11th and Locust, four or five times a week, and she, Bernard J. Jostes, and defendant ate together quite frequently. After 1958 she went downtown practically every day, Tuesdays and Thursdays included, about 10:00 a. m. She roamed the streets and was in department stores until she went to work.

Arthur H. Heidsieck, defendant, a lawyer, was younger than Mr. Adams, and had assisted Mr. Adams in his practice.

Mrs. Adams executed a number of wills, which indicated that her relatives were Mrs. Edna Cuthbert, of Clayton, Missouri, and Mrs. Elinor Page, of Blanchester, Ohio, nieces, and Robert Miller, of Los Angeles, California, and Clark Butler, of Richmond Heights, Missouri, nephews. In her wills of April 8, 1955, and October 15, 1956, she named Arthur H. Heidsieck as executor. In her wills of September 13, 1958, October 10, 1958, and December 3, 1958, she made specific bequests of $15,000 to Arthur H. Heidsieck and appointed him executor of her estate. In her will of December 16, 1959 (the date of the transfer here involved), she made specific monetary bequests totaling $4,000 to her niece Mrs. Page and her two nephews, and named her niece Mrs. Cuthbert residuary beneficiary and executrix of her estate. The real parties in interest here are Mrs. Cuthbert, as residuary beneficiary, and defendant.

Mrs. Cuthbert was the only witness for plaintiff. She, as did some of defendant's witnesses, gave testimony on Mrs. Adams working for Mr. Brooks, eating at Hulling's Restaurant, and Mrs. Adams' physical condition. She testified to the following effect: After Mr. Adams' death she was very close to Mrs. Adams. Mrs. Adams started talking about defendant right after Mr. Adams' death. Defendant, as time passed, played an ever more important role in Mrs. Adams' life. "The most important friend in her life was Mr. Heidsieck." Mrs. Adams told witness many times she sought defendant's advice on legal matters, her wills, and financial matters relating to her stocks. Mrs. Adams never did have any business ability. She told witness defendant visited in her apartment and helped her, for instance, sewed buttons on her clothes. Witness thought she had heard Mr. Adams left an estate of $22,000. After her husband's death Mrs. Adams worked in the linen room of a hospital and witness knew defendant advised Mrs. Adams she could not live on the interest of $22,000 and should invest her money. Witness and her husband "put Mrs. Adams and Mr. Heidsieck on the train for California in 1955." She thought Mrs. Adams was away about a month, but didn't know. Mrs. Adams lived in a small apartment, about 5700 west. She was quiet and despondent the last two or three years.

September 24, 1958, Mrs. Adams had plaintiff accompany her to the Mercantile Trust Company to see what stocks she had in her lockbox and their value. Mrs. Adams had certificates for 415 shares of General Motors, 200 shares of United States Steel, 113 shares of Sun Oil, 100 shares of Bond Stores, 50 shares of Laclede Gas, 100 shares of Greyhound Bus, and 150 shares of Portland General Electric. Witness testified said stocks then had a market value of $51,438. At that time Mrs. Adams placed her box in the joint names of herself and witness. In November, 1959, Mrs. Adams had the Laclede Gas and Sun Oil stock issued in the joint names of herself and witness with the right of survivorship. Mrs. Adams' guardianship estate inventoried (November, 1960) $32,655.81, exclusive of the United States Steel stock. She informed Mrs. Cuthbert defendant had told her she was worth $62,000 in December, 1959.

From 1958 on Mrs. Adams made complaint about her eyesight, telling plaintiff she could not see. Plaintiff testified Mrs. Adams could not tell the difference between a $1 and a $5 bill, or a quarter and a nickel, and that witness read to Mrs. Adams letters received from a sister. Mrs. Adams could see well enough to be out on the streets.

Mrs. Cuthbert, following Mrs. Adams' injury and hopsitalization, had occasion to enter her lockbox and discovered that the United States Steel stock was missing. She reported this to Mrs. Adams and, after talking with her, consulted Mr. John Sharpe, a lawyer. On March 17, 1960, Mrs. Adams signed the following letter addressed to Mr. Sharpe:

"This is your authority to act as my attorney on my behalf, to recover from Mr. Arthur Heidsieck, two hundred (200) shares of stock in United States Steel Corporation, which were registered in my name in December of 1959 and which I feel were transferred to Mr. Heidsieck without sufficient consideration."

The evidence on behalf of defendant follows.

Ernst C. Stifel was a "customer's man" for the A. G. Edwards brokerage firm of St. Louis. He knew Mrs. Adams, who had purchased stock through him on several occasions during the last ten or eleven years, and also knew Mr. Heidsieck. Mrs. Adams and defendant came to his desk December 16, 1959. Mrs. Adams said she wanted to transfer 200 shares of United States Steel stock to defendant. Mrs. Adams had the stock. (She had received the current dividend.) He informed them transfers were made at the cashier's cage and took them there. There is some confusion in this witness's testimony. Plaintiff stresses the following answer to whether Mrs. Adams or defendant gave the directions as to how the new certificates were to be made out: "A As to who the new certificates were to be made out, I just don't remember whether Mr. Heidsieck or Mrs. Adams, but the point was—." A receipt was made for the two certificates of 100 shares each and issued by the brokerage firm to "Mabel S. Adams" for said stock to be transferred as per instructions. A girl was in charge of the cashier's cage. Asked: "Now, who gave [the girl] the instructions to transfer as per instructions?" the witness answered: "Mrs. Adams gave them to me and I gave them to the girl in the cage to transfer." The girl asked Mrs. Adams to endorse the certificates, which Mrs. Adams did, and to wait for her receipt. Other testimony by this witness was to the effect Mrs. Adams directed the transfer of this stock to Mr. Heidsieck. Mrs. Adams' signatures endorsing the certificates to defendant were guaranteed by the A. G. Edwards brokerage firm. Mrs. Adams also executed and delivered the following statement, defendant's Exhibit A, dated at St. Louis, Mo., December 16, 1959:

"TO WHOM IT MAY CONCERN: This is to show that the Two Hundred (200) Shares of Common Stock of U. S. Steel was transferred to Arthur H. Heidsieck as a gift."

Witness Stifel testified in chief Mrs. Adams executed defendant's Exhibit A while at the broker's office December 16th; that it was her signature but he was not certain he saw her sign it, and she afterwards explained why she was making this gift. On cross-examination he testified the first time he had seen "this particular piece of paper," referring to the exhibit shown to him, was the day of the trial; that if it came from his brokerage office they had a copy of it. The brokerage firm billed Mrs. Adams for the transfer charges ($10.42), which defendant paid, and the broker delivered the new certificates to him.

Witness Stifel testified that following the transaction he had a conversation with Mrs. Adams in which "[s]he said she was making a gift of the two hundred shares of United States Steel to Mr. Heidsieck for all the things he had done for her over the seventeen years—for about the last fifteen or seventeen years, and he had done a lot of work for her"; that he had done work for her since her husband died in 1943 and "that she hadn't paid him for anything over the years and for that reason she was giving him the two hundred shares of United States Steel stock, that's the way I got it."

In a Federal gift tax return of January 7, 1960, Mrs. Adams declared under the penalties of perjury that she had examined said return which, to the best of her knowledge and belief, was a true and complete return; that she transferred 200 shares of common stock of United States Steel Corporation to Arthur H. Heidsieck, having a value of $19,975 as of the date of transfer; and that said transfer was "without an adequate and full consideration in money or money's worth."

Louis A. Brooks, the lawyer for whom Mrs. Adams worked, testified he was surprised when informed of her age; she mentioned having trouble with her glasses; she kept a record of his office calls; her handwriting was fairly legible the last two or three months, and that she performed her work properly and gave no evidence of mental suffering.

Mrs. Goldie Zimmerman, a supervisor at Hulling's Restaurant, testified that she knew Mrs. Adams for four years; that she and Mr. Jostes witnessed Mrs. Adams' will of September 13, 1958; that she observed nothing eccentric about Mrs. Adams' conduct; that Mrs. Adams dressed modestly and in proper style, and was of sound mind.

Bernard J. Jostes knew Mr. Heidsieck for six to ten years and Mrs. Adams for six to eight years. He testified he might see Mrs. Adams at the restaurant 15 or 20 times a month; that Mrs. Adams, defendant and witness sat at the same table quite frequently, but not at any regular times. Mrs. Adams had other friends she ate with. Occasionally, not too frequently, Mrs. Adams would ask defendant's advice and witness would leave the table. When he witnessed Mrs. Adams' will of September 13, 1958, he banteringly asked if she had mentioned him in her will and she pointed to Mr. Heidsieck and said "to him I did." He also met Mrs. Adams at parties and sometimes took her to parties. He stated she had a mind of her own, did not appear to be physically failing or in infirm health, or give any indication of declining mental vigor.

Mrs. Zimmerman testified she never noticed Mrs. Adams having trouble seeing during the last year she ate at the restaurant. Mr. Jostes testified there was nothing wrong with Mrs. Adams' eyesight; she gave no indication it was bad; she would pay her bill at the restaurant and had no difficulty distinguishing the value of paper money; she held her will up like she was reading it on the occasion he signed it as a witness.

We have said that a gift or a transfer of assets to one in a fiduciary relationship with the donor or grantor, such as in this case, is presumed to be by reason of undue influence exercised upon the donor or grantor in those instances where the evidence per-

mits of the inference that the beneficiary of said gift or transfer was active in causing or assisting in causing the execution thereof. (Loehr v. Starke, 332 Mo. 131, 144, 56 S.W.2d 772, 777; Pulitzer v. Chapman, 337 Mo. 298, 85 S.W.2d 400, 409[3], 410); that when supported by probative evidence said presumption makes a prima facie case which does not disappear upon the introduction of rebutting testimony (Loehr, supra, 56 S.W.2d 1. c. 776 [3]; Nelson v. Hammett, Mo., 189 S.W.2d 238, 243[9]) and that such proof casts the burden of going forward with the evidence on the donee or grantee to show that the gift was fair and equitable (Nelson, supra [7, 8]; Been v. Jolly, Mo., 247 S.W.2d 840, 854[4–6, 8]; Sebree v. Rosen, Mo., 349 S.W.2d 865, 882[20]). " 'This presumption rests upon three facts for its formation: First, the fiduciary relation; second, the gift or devise to, or in the interest of the guardian; third, an opportunity for an exercise of undue influence.' " Loehr, supra, 56 S.W.2d 1. c. 777, quoting Bridwell v. Swank, 84 Mo. 455, 467.

Laspy v. Anderson, Mo., 361 S.W.2d 680, 682[2], citing authority, states: "The law is well established in this state and elsewhere that public policy dictates the necessity to protect the confidential and fiduciary attorney-client relationship. Consequently, when a conveyance from a client to an attorney is attacked it is considered presumptively fraudulent and the burden is on the attorney to prove by convincing evidence that the transaction evidenced by the conveyance, as well as the conveyance itself, was fair and equitable in every respect." See also Thompson v. Stearns, 197 Mo.App. 344, 356, 195 S.W. 43, 46. The law with respect to gifts is to like effect. 7 C.J.S. Attorney and Client, § 129, p. 971; 5 Am.Jur. 290, § 51. Consult Annotations, 24 A.L.R.2d 1288; 70 A.L.R.2d 591.

Should a grantor convey his property to his attorney and the attorney actively participate in the transfer, or in making a contract with his client, such facts if admitted or shown "would not necessarily compel a finding for plaintiff on the issue of undue influence, but would present an issue of fact." Nelson v. Hammett, supra [9]; Been v. Jolly, supra [4–8].

With defendant admitting the fiduciary relationship and the performance of legal and financial services for his client over the years, his implication that plaintiff's case based on undue influence rests in suspicion and conjecture is without substance.

We find allegations in defendant's pleadings to the effect that for seventeen years and without compensation he performed legal and financial services for Mrs. Adams; that the main services involved the drafting of seven wills; the making of yearly income tax returns, personal property tax returns, and a gift tax return; the collection of $22,000 life insurance (no contest is indicated); the payment of $42 per month Social Security after she had been twice refused; and that through his efforts and advice her assets increased from $22,000 to about $62,000, and her annual income rose from about $600 to $2,245. Alleging she consulted him on an average of two hours a week, he estimated his services, $15 an hour for 1,768 hours, worth $26,520.

Witness Stifel testified Mrs. Adams stated she had never paid defendant anything and she was making a gift of the United States Steel stock to defendant for all the things he had done for her over the years since her husband's death. Her signed statement "To Whom It May Concern" was that she had transferred the stock "as a gift" to defendant, and her Federal gift tax return of January 7, 1960, was to like effect. These instruments and the several wills in which Mrs. Adams bequeathed $15,000 to defendant were executed during the client-attorney relationship and are subject to the inference they were executed as a result of undue influence exercised by defendant. The trier of the facts could find that her statement "To Whom It May Concern" and her Federal gift tax return were aids planned by defendant to secure said stock from his client without his payment

of taxes on income earned. Her letter to her attorney, Mr. Sharpe, sought the recovery of the stock on the ground it had been transferred to defendant "without sufficient consideration." We think it plain enough that Mrs. Adams considered the transfer discharged her obligations to defendant and defendant must have so understood. Without this background defendant has little standing on the theory of a gift.

Mrs. Adams, active for her age, was not incompetent; but she did not possess the mental alertness and vigor of defendant and she relied upon him and was subject to his influence. This necessitated frankness and fair dealing with her on his part. He accompanied her whenever she had occasion to go to the brokers and brought her there on the day of the transfer; told her where, if he did not instruct her, to endorse the stock certificates; paid the charges for the transfer of the stock although these were billed to Mrs. Adams, and picked up the new certificates at the broker's. This record does not establish that Mrs. Adams had independent and disinterested advice regarding her transfer of the stock and her reasonable obligations to defendant (Been v. Jolly, Mo., 247 S.W.2d 840, 846) or that she discussed her intentions before or after said transfer with third parties (except broker Stifel at the time of the transaction) and made known in unmistakable language her feelings and reasons for making said transfer (Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 64 et seq.). Defendant's position would be much improved had Mrs. Adams secured and acted upon the advice of some competent disinterested person who was cognizant of all the circumstances connected with the transaction.

Mrs. Adams was about 64 years of age when her husband died and 80 when she transferred the stock to defendant. This stock then had a market value of $19,975. Her employment consisted of working in the linen room of a hospital and, later, three afternoons a week as a receptionist for an attorney. The record discloses the performance by defendant for Mrs. Adams of no legal work of any extraordinary nature or monetary value and only a few, say approximately 10, financial transactions, none of which were shown to involve any considerable sum. There was no attempt by defendant to show that his services to Mrs. Adams had a value approximating $19,975. There is nothing of record to show that any transaction prior to her transfer of the stock to defendant involved any considerable sum of money; and no showing whatever that Mrs. Adams received legal and financial services from defendant averaging in value $100 and more monthly over the sixteen-year period. The chancellor was not required to believe defendant's witnesses. Mueller v. Mueller, Mo., 318 S.W.2d 365, 369[4, 5]. Under the authorities defendant has not met the burden of going forward with the evidence. See Laspy v. Anderson and other cases cited supra.

The decree and judgment appealed from should be and is affirmed, and the cause is remanded for further proceedings to effectuate said judgment.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All of the Judges concur.